**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHEPARD BROADFOOT, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BARRICK GOLD CORPORATION, KELVIN DUSHNISKY, CATHERINE RAW, RICHARD WILLIAMS, and JORGE PALMES, <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Shepard Broadfoot ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Barrick Gold Corporation, ("Barrick" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Barrick; and (c) review of other publicly available information concerning Barrick.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Barrick's securities between February 16, 2017, and April 24, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Barrick is a gold mining company that purportedly engages in exploration and mine development. The Company also produces and sells gold and copper.

3.      The Company has a history of pipe ruptures and chemical spills at its Valedero mine in the San Juan Province of Argentina. On September 13, 2015, the Company identified a valve failure on a leach pad pipeline, resulting in a release of cyanide-bearing process solution into a nearby waterway. This resulted in a temporary court order restricting the addition of new cyanide to the mine's processing circuit. The restriction was subsequently lifted, however, on September 24, 2015. Then, on September 8, 2016 a pipe carrying process solution was damaged by a large block of ice that had rolled down a nearby slope, resulting in a temporary suspension of operations at the Veladero mine. Operations resumed on October 4, 2016.

4.      On February 16, 2017, the first day of the Class Period, the Company held a conference call to discuss its 2016 fiscal year financial results. On the call, Defendant Palmes stated that "[a]t Veladero, 2016 was a very challenging year" do to the pipe-related damage, but

---

[1] "Defendants" refers to Barrick Gold Corporation, Kelvin Dushnisky, Catherine Raw, Richard Williams, and Jorge Palmes, collectively.

that the Company "completed a series of remedial works to prevent such an incident from occurring again." On the same call, Defendant Palmes provided fiscal year 2017 Veladero production guidance, stating: "For 2017, we expect increased production of 770,000 ounces to 830,000 ounces at all-in sustaining cost of $840 per ounce to $940 per ounce."

5.      On March 28, 2017, the Company's Veladero troubles reappeared, when a pipe carrying gold-bearing solution ruptured.

6.      Surprisingly, in response to the rupture, the Company reaffirmed its fiscal year 2017 guidance. On March 30, 2017, the Company stated: "[a]t this time, we do not anticipate a material impact to Veladero's 2017 production guidance."

7.      On April 24, 2017, the truth about the Veladero mine began to emerge when the Company issued a press release announcing its first quarter 2017 financial results. Therein, the Company revised its full year guidance, stating that "[f]ull-year gold production is now expected to be 5.3-5.6 million ounces, down from our previous range of 5.6-5.9 million ounces." The Company further stated that "[a]pproximately two-thirds of this reduction is attributable to the anticipated sale of 50 percent of Veladero." The Company also provided Veladero-specific guidance, stating: "we now expect full-year production at Veladero of 630,000-730,000 ounces of gold, at a cost of sales of $740-$790 per ounce, and all-in sustaining costs of $890-$990 per ounce. . . . This compares to our original 2017 guidance of 770,000-830,000 ounces (100 percent basis), at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce."

8.      On this news, the Company's share price declined $2.15 per share, or 11.3%, to close at $16.89 per share on April 25, 2017, on unusually heavy trading volume.

9.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the pipes and safety systems at the Veladero mine were not robust enough to prevent gold-bearing solution spills; (2) that, as a result, Argentinian authorities would restrict the addition of cyanide to the Veladero mine's heap leach facility and require remedial work; (3) that these developments

would impact (and were impacting) the production capacity of the Veladero mine; (4) that as such, the Company's Veladero mine production guidance and total gold production guidance were overstated; and (5) that, as a result of the foregoing, Defendants' statements about Barrick's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

10.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this Judicial District.

14.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.    Plaintiff Shepard Broadfoot, as set forth in the accompanying certification, incorporated by reference herein, purchased Barrick securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.      Defendant Barrick Gold Corporation is incorporated in Ontario, Canada and its headquarters are in Toronto, Canada.  Barrick's common shares trade on the New York Stock Exchange ("NYSE") under the symbol "ABX."

17.      Defendant Kelvin Dushnisky ("Dushnisky") was the President and a Director of Barrick at all relevant times.

18.      Defendant Catherine Raw ("Raw") was the Vice President and Chief Financial Officer ("CFO") of Barrick at all relevant times.

19.      Defendant Richard Williams ("Williams") was the Chief Operating Officer ("COO") of Barrick at all relevant times.

20.      Defendant Jorge Palmes ("Palmes") was the Executive General Manager that oversaw Barrick's Veladero mine at all relevant times.

21.      Defendants Dushnisky, Raw, Williams, and Palmes (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Barrick's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.      Barrick is a gold mining company that purportedly engages in exploration and mine development.  The Company also produces and sells gold and copper.

23.      The Company has a history of pipe ruptures and chemical spills at its Valedero

mine in the San Juan Province of Argentina.  On September 13, 2015, the Company identified a valve failure on a leach pad pipeline, resulting in a release of cyanide-bearing process solution into a nearby waterway.  This resulted in a temporary court order restricting the addition of new cyanide to the mine's processing circuit.  The restriction was subsequently lifted, however, on September 24, 2015.  Then, on September 8, 2016 a pipe carrying process solution was damaged by a large block of ice that had rolled down a nearby slope, resulting in a temporary suspension of operations at the Veladero mine.  Operations resumed on October 4, 2016.

**Materially False and Misleading**
**Statements Issued During the Class Period**

24.     The Class Period begins on February 16, 2017.  On that day, the Company held a conference call to discuss its 2016 fiscal year financial results.  On the call, Defendant Palmes stated, in relevant part:

> At Veladero, 2016 was a very challenging year. In Q2, severe winter-related resulted in 42 days of lost production. In Q3, production was impacted by the two weeks suspension of an operation due to environmental incident quickly followed by a recovery action plan in Q4. ***We previously completed a series of remedial works to prevent such an incident from occurring again***, including the deployment of unmanned aerial vehicles for remote sensing.

(Emphasis added.)   On the same call, Defendant Palmes provided fiscal year 2017 Veladero production guidance, stating: "For 2017, we expect increased production of 770,000 ounces to 830,000 ounces at all-in sustaining cost of $840 per ounce to $940 per ounce."

25.     On March 29, 2017, the Company issued a statement disclosing that on March 28, 2017, "the monitoring system at Veladero detected a rupture on a pipe carrying gold-bearing solution on the leach pad."  The Company further stated:

> Procedures were immediately activated to contain and mitigate the situation, and the Company quickly corrected the issue. At the same time, the Company shared this information with San Juan provincial authorities.

> All solution was contained within the operating facility.

> There was no impact to people or the environment.

26.     On March 30, 2017, the Company issued a press release entitled "Barrick Reports Restrictions at Veladero Mine Heap Leach Facility."  Therein, the Company stated:

Barrick Gold Corporation . . . today reported that the Government of San Juan province, Argentina, has temporarily restricted the addition of cyanide to the Veladero mine's heap leach facility pending the verification that remedial works have been completed. The Company is working to complete this remediation as quickly as possible.

On the evening of March 28, the monitoring system at Veladero detected a rupture of a pipe carrying gold-bearing solution on the leach pad. All solution was contained within the operating site; no solution reached any diversion channels or watercourses. The Company promptly notified San Juan provincial authorities, who inspected the site on March 29.

The safety of people and the environment remains Barrick's top priority. The incident did not pose any threat to the health of employees, communities, or the environment.

***At this time, we do not anticipate a material impact to Veladero's 2017 production guidance.***

(Emphasis added.)

27.     On April 6, 2017, the Company issed a press release entitled "Barrick Announces Strategic Cooperation Agreement with Shandong Gold."  Therein, the Company laid out the details of the deal and discussed the its impact on the Veladero mine.  In relevant part, the Company stated:

Barrick Gold Corporation . . . today announced that it has entered into a strategic cooperation agreement with Shandong Gold Group Co., Ltd. ("Shandong"), the leading underground mining company in China, based in Jinan, Shandong province.

As a first step in the new partnership, ***Shandong Gold Mining Co., Ltd***, the listed company of Shandong Gold Group, ***will acquire 50 percent of Barrick's Veladero mine in San Juan province, Argentina, for $960 million***. As a second step, Barrick and Shandong will form a working group to explore the joint development of the Pascua-Lama deposit. As a third step, both companies will evaluate additional investment opportunities on the highly prospective El Indio Gold Belt on the border of Argentina and Chile, which hosts a cluster of world-class gold mines and projects including Veladero, Pascua-Lama, and Alturas.

"Our ambition is to make Barrick a leading twenty-first-century company in any industry in any jurisdiction, and by definition, that means creating a distinctive, enduring, and trust-based relationship with China and China's best companies. This agreement moves us down that path. Shandong is an ideal partner to help us unlock the untapped mineral wealth of the El Indio Belt over the long-term, while working with us to generate more value from the Veladero mine today," said

Barrick Executive Chairman John L. Thornton. "We look forward to working in partnership with Shandong, sharing mining and development expertise, talent, and capital in ways that will create added value for our respective owners, and our government and community partners in San Juan province."

"Our goal is to build a long-term relationship with Barrick, and this agreement encapsulates exactly what we wanted to achieve," said Shandong Chairman Chen Yumin. "In this global economy, it is more important than ever to find international partners with a common vision for developing mines and generating prosperity in an environmentally and socially responsible manner. We are excited to enter Argentina's dynamic mining industry in partnership with Barrick at Veladero, while exploring other opportunities in one of the most prospective mineral districts in the world."

Upon completion of the transaction, the Veladero mine will be overseen by a Joint Venture Board consisting of three nominees appointed by each company. In order to ensure continuity of operations, both companies intend to maintain the mine's current management team following closing of the transaction.

Proceeds from the transaction will be used to reduce debt and for investments in our business to grow free cash flow per share.

***The transaction is expected to close at the end of the second quarter of 2017, and is subject to regulatory and other approvals, including Shandong Gold Mining Co., Ltd shareholder approval, and other customary closing conditions.***

Shandong Gold Group Co. Ltd., the direct and indirect holder of 56 percent of the outstanding shares in Shandong Gold, has irrevocably agreed to vote in favor of the proposed transaction.

The transaction has received approvals from China's National Development and Reform Commission (NDRC), and the State-owned Assets Supervision and Administration Commission (SASAC) of Shandong Province. Applications for approval by other Chinese regulatory authorities, including MOFCOM (Ministry of Commerce) and SAFE (State Administration of Foreign Exchange), are underway.

Shandong has financing commitments in place for the full value of the transaction.

**Details of the Strategic Cooperation Agreement**

The Strategic Cooperation Agreement with Shandong is consistent with Barrick's strategy to develop partnerships of depth with the potential to create long-term value for the Company's owners, as well as our community and government partners.

Barrick and Shandong began to develop such a partnership in April of 2016 with a

meeting between the two companies' chairmen. In the year since, we have engaged extensively to understand each other's respective values, strategic priorities, and operating capabilities. Senior management and cross-functional teams have participated in multiple joint site visits to Barrick and Shandong operations in Argentina, Canada, and China. Given both companies' commitment to innovation in mining, we have established a channel to share ideas on using technology and digitization to achieve step changes in efficiency, safety, and environmental stewardship. Barrick's team is led by Chief Innovation Officer Michelle Ash. Shandong's team is led by Deputy General Manager for Technology Cui Lun.

Under the Agreement, Barrick and Shandong will leverage their respective strengths to optimize and enhance the value of the Veladero mine, in line with step one of the partnership. As step two, Shandong will work with Barrick to explore the potential of investing in and jointly developing the Pascua-Lama deposit. To advance this, Shandong will embed a team of underground mining engineers and project development specialists with Barrick's Pascua-Lama project team.

As step three, the companies have also agreed to work together to explore additional investment and development opportunities on the El Indio Belt, including the Alturas project, in addition to other global opportunities.

Complementing Barrick's operating experience and expertise in the region, Shandong will provide access to substantial internal engineering, construction, and mining expertise, with a particular focus on underground mining, as well as access to capital and equipment.

CIBC World Markets Inc. is acting as financial advisor to Barrick. Davies Ward Phillips & Vineberg LLP is acting as legal counsel to Barrick.

**About the Veladero mine**

The Veladero mine is located in the San Juan province of Argentina, on the highly prospective El Indo Belt, approximately 10 kilometers away from Barrick's Pascua-Lama project. Veladero is located at elevations of between 4,000-4,850 meters above sea level, approximately 375 kilometers northwest of the city of San Juan. As of December 31, 2016, the mine had proven and probable gold reserves of 6.7 million ounces, and measured and indicated gold resources of 3.3 million ounces. ***The mine is expected to produce 770,000-830,000 ounces of gold in 2017, at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce***.

(Some emphasis added.)

28.    On April 21, 2017, *Reuters* reported that Barrick and Shandong presented a $500 million plan on to make safety and environmental improvements to the Veladero gold mine.  In

the report, Defendant Williams is quoted stating "[w]e've got a plan over two years to invest half a billion dollars to develop Veladero operations" and "[t]he leach pad is going to be extended and developed and improved. So it's going to be re-engineered."

29.    The above statements identified in ¶¶24-28 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose: (1) that the pipes and safety systems at the Veladero mine were not robust enough to prevent gold-bearing solution spills; (2) that, as a result, Argentinian authorities would restrict the addition of cyanide to the Veladero mine's heap leach facility and require remedial work; (3) that these developments would impact (and were impacting) the production capacity of the Veladero mine; (4) that as such, the Company's Veladero mine production guidance and total gold production guidance were overstated; and (5) that, as a result of the foregoing, Defendants' statements about Barrick's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

30.    On April 24, 2017, the Company issued a press release announcing its first quarter 2017 financial results.  Therein, the Company, in relevant part, stated:

- Full-year gold production is now expected to be 5.3-5.6 million ounces, down from our previous range of 5.6-5.9 million ounces. Approximately two-thirds of this reduction is attributable to the anticipated sale of 50 percent of Veladero. Cost of sales and all-in sustaining cost guidance for the full year remains unchanged.

- A comprehensive plan to strengthen and improve the Veladero mine's operating systems is now under review by federal and provincial authorities in Argentina. Our adjusted guidance assumes normal leaching activities will resume in June, pending government approval and the lifting of judicial restrictions.

\*    \*    \*

We now expect full-year gold production of 5.3-5.6 million ounces, down from our previous range of 5.6-5.9 million ounces. A significant portion of this reduction is attributable to the anticipated sale of 50 percent of Veladero, which is expected to close at the end of the second quarter. Our updated guidance assumes no change to Acacia's full-year guidance as a result of the export ban on concentrates currently affecting Acacia's operations in Tanzania. It also assumes

the resumption of normal processing activities at Veladero in June, subject to government approval of proposed modifications to the mine's operating systems . . . .

\*       \*       \*

**Veladero Update**

On March 28, a coupling on a pipe carrying gold-bearing solution at the Veladero mine heap leach facility failed. Solution released from the rupture was contained within the operating site and did not result in any impact to the environment or people. The Company promptly notified San Juan provincial authorities, who inspected the site on March 29. On March 30, the Government of San Juan province temporarily restricted the addition of cyanide to the Veladero mine's heap leach facility, pending the completion of works to strengthen and improve the mine's operating systems.

Barrick presented its proposed work plan to San Juan provincial authorities on April 21, following extensive consultation with both federal and provincial officials and regulators. The provincial government has indicated it will take approximately two weeks to review the Company's proposals, a process that will also include federal authorities, including the national Ministry of Environment and Sustainable Development. Initial work on the proposed modifications to the heap leach facility has already begun, concurrent with the review by provincial and federal authorities. Our updated guidance assumes a resumption of normal leaching activities at the mine in June, subject to approval by the Government of San Juan province, the lifting of operating restrictions by the San Juan provincial court, and the resolution of regulatory and legal matters by the federal and provincial courts (for more information about these matters, please see Note 17 "Contingencies" of Barrick's first quarter financial statements and the notes thereto). This assumption is based on our assessment of the time required to complete the proposed modifications to the leach pad. The timing of approval for the resumption of leaching activities will depend on the actual progress of work, any potential new requirements, and a final evaluation of the completed modifications by provincial authorities. In parallel with the submission of a new technical plan for the operation, Barrick has also presented an updated community investment and engagement plan to the Government of San Juan and federal authorities for review.

***On a 100 percent basis, we now expect full-year production at Veladero of 630,000-730,000 ounces of gold, at a cost of sales of $740-$790 per ounce, and all-in sustaining costs of $890-$990 per ounce.*** Barrick's share of full-year production, assuming 50 percent ownership from July 1, is expected to be 430,000-480,000 ounces of gold. This compares to our original 2017 guidance of 770,000-830,000 ounces (100 percent basis), at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce.

(Emphasis added.)

31.     On this news, the Company's share price declined $2.15 per share, or 11.3%, to close at $16.89 per share on April 25, 2017, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Barrick's securities between February 16, 2017, and April 24, 2017, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Barrick's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Barrick shares were traded publicly during the Class Period on the NYSE.   As of March 31, 2017, Barrick had approximately 1,165,774,844 common shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Barrick or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Barrick; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

37. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<b><u>UNDISCLOSED ADVERSE FACTS</u></b>

38. The market for Barrick's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Barrick's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Barrick's securities relying upon the integrity of the market price of the Company's securities and market information relating to Barrick, and have been damaged thereby.

39. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Barrick's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Barrick's business, operations, and prospects as alleged herein.

40. At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Barrick's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

41.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.     During the Class Period, Plaintiff and the Class purchased Barrick's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

43.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Barrick, their control over, and/or receipt and/or modification of Barrick's allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Barrick, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

44.     The market for Barrick's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Barrick's securities traded at artificially inflated prices during the Class Period.  On February 16, 2017, the Company's share price closed at a Class Period high of $12.50 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Barrick's securities and market information relating to Barrick, and have been damaged thereby.

45.     During the Class Period, the artificial inflation of Barrick's share price was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Barrick's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Barrick and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

46.     At all relevant times, the market for Barrick's securities was an efficient market for the following reasons, among others:

(a)     Barrick shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Barrick filed periodic public reports with the SEC and/or

the NYSE;

(c)     Barrick regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Barrick was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Barrick's securities promptly digested current information regarding Barrick from all publicly available sources and reflected such information in Barrick's share price. Under these circumstances, all purchasers of Barrick's securities during the Class Period suffered similar injury through their purchase of Barrick's securities at artificially inflated prices and a presumption of reliance applies.

48.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Barrick who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Barrick's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

52.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Barrick's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Barrick's financial well-being and prospects, as specified herein.

54.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Barrick's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Barrick and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

55.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

56.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Barrick's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Barrick's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Barrick's securities during the Class Period at artificially high prices and were damaged thereby.

58. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Barrick was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Barrick securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     Individual Defendants acted as controlling persons of Barrick within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.     As set forth above, Barrick and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the

Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  May 10, 2017                                    **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Lesley F. Portnoy*
Lesley F. Portnoy (LP-1941)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

-and-

Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

## BARRICK GOLD CORPORATION SECURITIES LITIGATION

I, Shepard Broadfoot, individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1.   I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.   I did not purchase **BARRICK GOLD CORPORATION** the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.   My transactions in **BARRICK GOLD CORPORATION** during the Class Period set forth in the Complaint are as follows:

     (See attached transactions)

5.   I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6.   I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

5/10/2017

Date

DocuSigned by:

*Shepard Broadfoot*

F298BCE528E842D...    Shepard Broadfoot

**Shepard Broadfoot's Transactions in
Barrick Gold Corporation (ABX)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 02/24/2017 | Bought | 20 | $19.7000 |
| 03/16/2017 | Sold | -20 | $19.4400 |
| 03/21/2017 | Bought | 20 | $19.4700 |
| 03/22/2017 | Bought | 25 | $19.4850 |
| 03/23/2017 | Bought | 12 | $19.3553 |
| 04/19/2017 | Bought | 20 | $18.9747 |