**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BARRICK GOLD CORPORATION SECURITIES LITIGATION | )    **CASE NO. 1:17-CV-3507**<br>)<br>)    Hon. Naomi Reice Buchwald<br>)<br>)    <u>JURY TRIAL DEMANDED</u><br>) |

**CONSOLIDATED AMENDED COMPLAINT FOR**
**<u>VIOLATIONS OF FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ...................................................................................1

II.    JURISDICTION AND VENUE ..................................................................................6

III.   PARTIES .....................................................................................................................6

       A.  Plaintiffs ...........................................................................................................6

       B.  Defendants ........................................................................................................7

IV.    BACKGROUND ..........................................................................................................8

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
       AND OMISSIONS DURING THE CLASS PERIOD .....................................................20

VI.    THE TRUTH EMERGES ...........................................................................................23

VII.   ADDITIONAL SCIENTER ALLEGATIONS ...............................................................27

VIII.  LOSS CAUSATION / ECONOMIC LOSS ..................................................................30

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE:
       FRAUD-ON-THE-MARKET DOCTRINE ....................................................................31

X.     PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY.......................................32

XI.    CLASS ACTION ALLEGATIONS ..............................................................................33

XII.   COUNT I: Against All Defendants For Violations of Section 10(b)
       And Rule 10b-5 Promulgated Thereunder ..........................................................35

XIII.  COUNT II: Violations of Section 20(a) of the Exchange Act
       Against Individual Defendants ............................................................................38

XIV.   PRAYER FOR RELIEF ..............................................................................................40

XV.    DEMAND FOR TRIAL BY JURY ..............................................................................40

1.      Lead Plaintiff Ashwini Malhotra ("Plaintiff") brings this federal securities class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the purchasers of Barrick Gold Corporation ("Barrick Gold" or the "Company") common stock between February 16, 2017 and April 24, 2017, both dates inclusive (the "Class Period"), against Barrick Gold, its President and Director Kelvin Dushnisky ("Dushnisky"), its Vice President and Chief Financial Officer ("CFO") Catherine Raw ("Raw"), its Chief Operating Officer ("COO") Richard Williams ("Williams"), and its Executive General Manager Jorge Palmes ("Palmes")[1] (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Plaintiffs allege the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Barrick Gold, securities analysts' reports and advisories about the Company, press releases, earnings calls and other public statements issued by the Company and its executives, media reports about Barrick Gold, and interviews with witnesses with knowledge of the allegations herein. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

3.      This federal securities fraud action concerns the world's largest mining company, Barrick Gold, and one of its largest and most profitable mines, Veladero. During the Class Period, Barrick Gold falsely stated that the Company performed critical infrastructure repairs and preventative measures at Veladero when, in fact, it had not, and after a spill of cyanide solution, the third of its kind in 18 months and which would not have occurred had the

---

[1] Collectively, Dushnisky, Raw, Williams, and Palmes are referred to herein as the "Individual Defendants."

Company completed the repairs it said it had, Barrick Gold further misled investors to believe that the incident was inconsequential and would not have an impact on the Company's gold production, which it did.

4.      Veladero, perched high in the Andes Mountains on the Argentine side of the border between Argentina and Chile, is nestled amongst glaciers and rivers that provide vital drinking water to surrounding regions. Already locally unpopular due to its proximity to Argentina's prized glaciers and accompanying environmental concerns, Veladero and Barrick Gold encountered heavy scrutiny after a pipe rupture led to a massive spill of cyanide solution in September 2015. That spill, initially misrepresented by Barrick Gold as a small leak that resulted in "no contamination of the rivers in the Jáchal basin," is today considered the worst environmental disaster in Argentine history, with some reports estimating that over 3 million liters of cyanide solution contaminated at least three different rivers in the area.

5.      The spill sparked a wave of protests, as well as a strong response from local government. Nine high-ranking Barrick Gold employees at Veladero were charged (and eight of nine later convicted, with those convictions being upheld on appeal)[2] with criminal environmental pollution charges, and temporary cyanide-use restrictions were put into place decreasing gold production at Veladero. Nevertheless, Barrick Gold maintained its production guidance.

6.      Then, almost exactly one year later, Barrick Gold's Veladero mine suffered yet another cyanide solution leak, which the Company failed to disclose to the public in any detail

---

[2] On or around August 16, 2017, the First Chamber of the Criminal and Correctional Chamber rejected the appeal and confirmed the prosecution of eight of the nine executives, determining that the directors were responsible for "contamination by negligence and incompetence," according to article 24,051 of Argentina law on hazardous wastes.

for almost a full week and reportedly would not have disclosed but for a Barrick Gold employee blowing the whistle on the Company. Even then, Barrick Gold misreported the cause of the spill, according to a former high ranking employee at Veladero, Confidential Witness ("CW") 1, who worked at the mine for 15 years and never saw a moving block of ice capable of breaking a pipeline: "I know the place where it happened, I know the pipeline, I know the type of failure, and it was something that had happened before [at Veladero], just not at the same magnitude."

7.      Again local residents protested, and again there was a swift response by local government, including a suspension of operations for over two weeks, which significantly impacted the amount of gold produced at Veladero. In turn, the situation at Veladero distressed investors by significantly reducing Barrick Gold's bottom line. Moreover, local authorities began inspecting the mine and issuing deadlines for corrective actions to prevent future environmental incidents.

8.      On February 16, 2017, the beginning of the Class Period, Barrick Gold held a conference call with analysts during which Defendants eased investor concerns about repeated issues at Veladero. Specifically, Defendant Palmes, the senior executive responsible for overseeing the mine, stated in part: "At Veladero, 2016 was a very challenging year….In Q3, production was impacted by the two weeks suspension of an operation due to environmental incident quickly followed by a recovery action plan in Q4….*We previously completed a series of remedial works to prevent such an incident from occurring again*…." [Emphasis added]. Investors responded positively to Defendants' statements, but those statements were not true.

9.      Less than six weeks later, on March 28, 2017, a pipe failure led to the third cyanide solution spill at Veladero in 18 months. While Defendants assured investors that remedial efforts had been completed, in reality, Barrick Gold had ignored multiple orders from

3

local authorities to replace pipes prior to the spill. The local judge who had previously indicted Barrick Gold employees in connection with the 2015 spill stated that he had met with the head of the mining police and learned that, "if they had changed the pipes as ordered, the decoupling [of pipes that led to the spill] would not have occurred." San Juan province's Mining Minister Alberto Hensel also stated that Barrack Gold failed to complete an "urgent review" of the pipe system before the third spill.

10.    Defendants knew or recklessly disregarded that the Company had not completed the remedial works they said it had. In addition to statements from Defendant Palmes professing knowledge that such works had been completed (when, in truth, they had not), all senior executives had access to expense and cost records through the Company's Oracle software. According to CW2, a former Barrick accountant, all expenditures and capital costs for all the Company's mining sites were tracked on the Oracle platform, and senior executives could see every potential remedial measure taken at Veladero including the replacement of ruptured pipes.

11.    In response to the spill, the local government again restricted the addition of cyanide to the mine's processing facility pending verification that remedial works had been completed. Nevertheless, as Barrick Gold had done in response to previous spills, Defendants misrepresented the impact of the incident on gold production, repeatedly stating that the Company did not expect any material impact on Veladero's production guidance.

12.    In reality, remedial measures would be a massive undertaking that would keep cyanide-use restrictions in place for months. Barrick Gold would submit a plan to the government of San Juan province to make $500 million worth of necessary upgrades to prevent future spills, which included adding containment barriers, strengthening and moving pipes, and adding cameras to monitor the area.

13.     Moreover, Defendants knew or recklessly disregarded that cyanide restrictions were decreasing the mine's daily production. According to CW1, who collected and reported gold production statistics at Veladero, production numbers were communicated to Defendant Dushnisky on a daily basis, and all executives in Canada had access to daily, monthly, and yearly production statistics from the mine. These statistics would have demonstrated the decreased production as a result of cyanide restrictions, because as Barrick Gold's own spokesperson has acknowledged, the inability to add fresh cyanide decreases production efficiency: "As the existing solution circulates and loses potency, the amount of gold recovered will decline." But CW1 explained that Barrick Gold's policy was to maintain production guidance at all costs, regardless of process interruptions.

14.     On April 24, 2017, the truth underlying Defendants' materially false and misleading statements and omissions regarding Veladero's required remedial works and the impact of the March 28, 2017 spill was revealed when Barrick Gold released its first quarter 2017 financial results, in which the Company drastically reduced production guidance of Veladero from 770,000-830,000 ounces of gold to 630,000-730,000 ounces.

15.     Analysts noted that the "Surprisingly Weak Operating Results" were "due to the failure of the coupling pipe," and brought "Veladero Environment Issues Into Focus." As a result of the disclosure and the revelation of previously undisclosed truth regarding mining operations at Veladero, Barrick Gold's stock plummeted from $19.04 per share at close on April 24, 2017 to $16.89 per share at close on April 25, 2017, a decline of over 11% on very high trading volume.

16.     As a consequence of Defendants' Class Period materially misleading statements and omissions that obscured the true facts which were ultimately revealed on April 24, 2017, resulting in a precipitous decline in Barrick Gold's stock value, Plaintiff and the Class suffered

significant losses and damages.

## II.   <u>JURISDICTION AND VENUE</u>

17.     This complaint asserts claims under §§10 (b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5 ("Rule 10b-5").

18.     This Court has subject matter jurisdiction over this action under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

19.     Venue is proper in this District under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), (c), and (d). Many of the acts and transactions that constitute the alleged violations of the law, including the dissemination to the public of materially false and misleading statements of fact, occurred in substantial part in this Judicial District where Barrick Gold's stock trades on the New York Stock Exchange ("NYSE").

20.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

## III.   <u>THE PARTIES</u>

### A.   <u>Plaintiffs</u>

21.     Lead Plaintiff ASHWINI MALHOTRA, as set forth in his previously-filed certification [Dkt. # 24-1], incorporated herein by reference, purchased Barrick Gold stock during the Class Period and was damaged when the true facts were revealed, removing the

artificial inflation from the price of the stock at the end of the Class Period.

22.     Additional plaintiff BKW LIVING TRUST, as set forth in its previously-filed certification [Dkt. # 28-1], incorporated herein by reference, purchased Barrick Gold stock during the Class Period and was damaged when the true facts were revealed, removing the artificial inflation from the price of the stock at the end of the Class Period.

## B.     **Defendants**

23.     Defendant BARRICK GOLD is the largest gold mining company in the world. Founded in 1983 and incorporated in Ontario, Canada, Barrick Gold operates through four regional business units located in Australia, Africa, North America, and South America. Barrick Gold is engaged in the discovery, acquisition, development, production, and marketing of silver, gold, and copper. The Company's principal executive offices are located at Brookfield Place, TD Canada Trust Tower, Suite 3700, Toronto, Canada M5J 2S1. Barrick Gold's stock is registered and listed on the NYSE under the ticker symbol "ABX."

24.     Defendant KELVIN P.M. DUSHNISKY has served at all relevant times as Barrick Gold's President and Director. During the Class Period, Dushnisky used the instrumentalities of interstate commerce to make presentations to analysts and investors concerning Barrick Gold's operations and financial results. Dushnisky made, or had authority over the content and communication of, material misstatements and omissions throughout the Class Period.

25.     Defendant CATHERINE P. RAW has served as Barrick Gold's CFO and Executive Vice President since April 26, 2016 and throughout the Class Period. During the Class Period, Raw used the instrumentalities of interstate commerce to make presentations to

analysts and investors concerning Barrick Gold's operations and financial results. Raw made, or had authority over the content and communication of, material misstatements and omissions throughout the Class Period.

26.     Defendant RICHARD WILLIAMS has served at all relevant times as Barrick Gold's COO. During the Class Period, Williams used the instrumentalities of interstate commerce to make presentations to analysts and investors concerning Barrick Gold's operations and financial results. Williams made, or had authority over the content and communication of, material misstatements and omissions throughout the Class Period.

27.     Defendant JORGE PALMES has served at all relevant times as Barrick Gold's Executive General Manager, responsible for overseeing the Veladero mine. During the Class Period, Palmes used the instrumentalities of interstate commerce to make presentations to analysts and investors concerning Barrick Gold's operations and financial results. Palmes made, or had authority over the content and communication, of material misstatements and omissions throughout the Class Period.

28.     Defendants Dushnisky, Raw, Williams, and Palmes, because of their positions with Barrick Gold, had access to material non-public information available to them but not to the public and knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were materially false and misleading when made.

## IV.  **BACKGROUND**

### **Overview of the Company and the Veladero Mine operation**

29.     Founded in 1983 with its headquarters in Toronto, Ontario, Canada, Barrick

Gold is the largest gold mining company in the world. Barrick Gold has mining operations across the globe – in Argentina, Australia, Canada, Chile, the Dominican Republic, Papua New Guinea, Peru, Saudi Arabia, the United States, and Zambia – but five core mines in the Americas account for approximately 70% of the Company's total gold production. One of these top five mines is the Veladero mine located in Argentina.

30.     In 1994, Barrick Gold acquired Lac Minerals Ltd., a Canadian mining company, which, along with another Canadian company, possessed exploration rights to Veladero. From 1996 through 1998, Barrick successfully explored Veladero as part of a joint venture (with a company with which Barrick later merged in December 2001, resulting in a Barrick gaining 100% control of Veladero), and full construction of the mine commenced in late 2003. Barrick announced the first gold pour from the mine in September 2005.

31.     Located approximately 4,000 to 4,850 meters high in the Andes Mountains on the Argentina side of the border between Chile's Huasco province and Argentina's San Juan province, the Veladero mine sits among glaciers that supply vital drinking water when rain is scarce. The mine is a conventional open-pit mine (or strip mine), meaning that rock and minerals are extracted from the earth by their elimination from an open pit or borrow. As opposed to extractive methods that require tunneling into the earth, open-pit methods are typically used when the desired minerals are found close to the surface.

32.     Once extracted, the ore is crushed at the open pit, placed on an overland conveyor and transported to a leach pad area where the gold is then separated from the ore. The separation process, also known as heap leaching, uses a series of chemical reactions to extract the gold from the ore by absorbing specific minerals and then re-separating them after their division from other earth materials. At Veladero, Barrick Gold would place the ore on the leach

pad liner, and use a drip system to pour a cyanide-based solution over the ore to separate the gold from the other materials. The gold is then smelted into doré bars on-site and shipped to an outside refinery for processing into bullion.

33.   As of December 31, 2016, Barrick Gold estimated that the Veladero mine contained approximately 3,375,000 ounces of proven and probable gold reserves.

### The Largest Environmental Disaster in Argentine History

34.   On September 13, 2015, a valve on a leach pad pipeline at Veladero failed, resulting in a massive spill of the cyanide-bearing solution used in the gold-separation process.

35.   CW1, who worked at Barrick Gold from February 2001 to February 2016 and was Veladero's Process Chief at the time, vividly remembers details of the spill. As Process Chief, CW1's responsibilities involved a wide variety of tasks related to the everyday operation of the mine, including monitoring daily production numbers, reporting how daily production compared to the daily production goal, as well as the mine's progress on monthly and yearly production goals. His principal responsibility at the time, however, was to ensure that Veladero's heap leach was working properly.

36.   As CW1 recalls, September 13, 2015 was a Sunday, so CW1 had the day off. Around noon that day, while celebrating a friend's 40th birthday, CW1's BlackBerry started receiving a barrage of emails. After reading them, CW1 went pale, knowing that the event described in his emails would be in every newspaper around the country the next day. CW1's spouse noted the expression of shock and asked, "Did somebody die?" and CW1 replied, "No, it's worse."

37.   According to CW1, the valve that failed was part of a system that had been added on as an expansion to Veladero, which was not part of the original mine infrastructure. In

fact, CW1 did not even know of the existence of the valve until the incident. But the problem, as CW1 explained, was that the monitoring instruments at the mine were not precise enough to detect the extra flow of cyanide solution that the broken valve allowed into the heap leach. The solution began to accumulate, and then overflowed. CW1 said that Barrick Gold was completely unprepared for cyanide solution to escape from the side of the heap leach.

38.    Shortly after the spill, a Barrick Gold employee at Veladero sent the following Whatsapp message alerting locals of the spill:

> Today there was a spill of 15,000 liters of cyanide and mercury in Veladero directly into the river. The employees of the mine cannot say anything but the governor and the mining police know, but surely the population will be the last to know. PLEASE DO NOT USE WATER FROM THE TAP TO DRINK, COOK, ETC. This information is filtered from the same employees of the mining company.[3]

39.    In a statement the following day, however, Barrick Gold downplayed the spill as a small leak that "was detected almost immediately and the valve shut down." The Company went on to unequivocally reject reports that the spill had contaminated drinking water, stating: "In light of a series of unfounded statements, Barrick would like to inform that there was no contamination of the rivers in the Jáchal basin….We want to make absolutely clear that there was only material damage to a pipe that did not affect the health of workers." Barrick Gold further assured that there are "no health risks for employees or the surrounding community."

40.    The next day, on September 15, 2015, the provincial government of San Juan contradicted Barrick Gold's assurances, warning residents to "avoid and/or limit the consumption of water" from the river. Local prosecutor Guillermo De Sanctis filed an investigation into Barrick Gold's conduct to determine whether the pipeline break was due to

---

[3] The message is translated from its original Spanish: "Hoy hubo un derrame de 15,000 litros de cianuyo y mercurio en veladero directamente al rio. Los empleados de la mina no pueden decir nada pero sabe el gobernador y la policia minera pero seguramente la poblacion sera la ultima en enterarse. POR FAVOR NO USAR AGUA DE LA CANILLA PARA TOMAR, COCINAR, ETC. Esta informacion se filtro de los mismos empleados de la minera."

faulty human behavior or natural causes, and to further determine if Barrick Gold should be criminally liable for damages.

41.     It was not until September 16, 2015 that Barrick Gold admitted that the cyanide had reached the nearby Las Taguas River. A team of Barrick Gold technicians conducted an internal investigation into the spill and released a preliminary report confirming that 224,000 liters of cyanide solution spilled in the incident. Nevertheless, the Company once again downplayed the spill, noting that the cyanide had dissipated with "no impact on people's health." That same day, an environmental emergency was declared in the town of Jáchal, and Judge Pablo Oritja of the Judicial Court of Jáchal ordered a five-day suspension of the gold leaching process at Veladero. The news triggered a strong reaction from local residents, who took to the streets to protest Barrick's mining activities at Veladero.

42.     On September 23, 2015, Barrick Gold admitted that the extent of the spill was much larger and more serious than previously stated, announcing that over 1 million liters of the solution spilled into the Potrerillos River. According to some reports, the total quantity of cyanide-containing solution that spilled in the incident exceeded 3 million liters, and contaminated at least three different rivers. The September 13, 2015 Veladero spill is regarded as the largest environmental disaster in Argentine history.

43.     On September 25, 2015, Judge Oritja indicted nine Barrick Gold employees with environmental pollution charges: Leandro Poblete (Chief of Processes); Segundo Alvarez (Second Chief of Processes); Carlo Cabanillas (Manager of the Mines); Angel Escudero (Manager of Risk Prevention); Osvaldo Brocca (Supervisor of the Environment); David Sanchez (Maintenance Supervisor); Ricardo Cortez (Supervisor of the Environment); Walter Pizarro (Manager of Processes); and Antonio Adames (General Manager). More specifically, the nine

individuals were accused of violating Article 24,051 of the Argentina national laws on hazardous waste, which carried sentences between one month and two years of "suspended"[4] prison for causing "a dangerous adulteration to water, soil, or air out of negligence or not following the law."

44.     That day, Barrick Gold also announced that the processing restrictions at the Veladero mine had been lifted, but that the Company did not expect any material impact to production numbers as a result of the incident. CW1 explained that this was not true. According to CW1, although Veladero kept operating with the cyanide that was already in the leach circuit, the government's prohibition from adding further cyanide to the circuit made the mining process less efficient and production decreased. In fact, CW1 estimated that gold production dropped as much as 10% during those days in which Barrick was not allowed to add cyanide to the solution circuit.

45.     One of CW1's primary job responsibilities was reporting daily production numbers, and every day that production numbers were down, CW1 would have to explain what actions they were taking to get production back on track. CW1 explained that Defendant Dushnisky was informed on these production numbers—reported in parts per million of gold in the solution and the solution's flow—daily, and all executives in Canada would have had access to the same production numbers CW1 did. More specifically, CW1 reported production numbers to the general manager, who in turn sent the daily report, which showed production numbers for the day and for the month, directly to corporate headquarters in Canada. This report would also show any "new items" such as pipe ruptures. Additionally, Barrick Gold held production planning meetings in which the Veladero plant manager reported production numbers directly to

---

[4] The term "suspended" means that, if convicted, violators will likely not go to prison for a first time offense, as people receiving sentences less than three years are allowed to apply for probation.

headquarters.

46.     CW1 explained that Barrick Gold would always insist on maintaining production goals when any incident such as the September 13, 2015 spill occurred, regardless of its effect on production, and would just push employees to try and recuperate the lost production. In one particularly egregious example from November 2006 when a Barrick Gold vehicle fell down a hill killing both employees inside, CW1 remembered that Veladero was completely shut down for about seven days, but the Company "didn't touch the production numbers."

**Déjà Vu at Veladero**

47.     On September 8, 2016, just days before the anniversary of the country's worst environmental disaster, Barrick Gold's Veladero mine produced another cyanide solution leak. Like the previous disaster, Barrick Gold did not immediately release details of the spill, and indeed, this time withheld any information on the leak until almost a full week after the incident.

48.     It was not until September 12, 2016 that the Company made the spill public, and did not disclose any details regarding the event until the evening of September 14 when it released a statement explaining: "there was an incident in the tailings pond caused by a break in an 18" pipeline containing solution. According to preliminary investigations, this break occurred after the pipe was struck by a chunk of ice." Reportedly, the Company had no intentions of even reporting the spill until a Barrick Gold employee planned on blowing the whistle on the Company.[5] And again, as with the previous spill, Barrick Gold assured the public that the solution did not reach the local water source and claimed that there "was no threat to the health of workers, local communities, or the environment." Indeed, Barrick Gold's statement did not even contain the word "cyanide," but merely said "solution." Furthermore, Barrick Gold reported

---

[5] *See* September 19, 2016 Incakolanews.blogspot.com article, "Argentina: The Veladero mine causes political pain."

that the incident had not disrupted any mining activity at the Veladero mine; however, later that evening, during a press conference, San Juan governor Serio Uñac confirmed that operations at the mine would be shut down and remain shut down until the risk level from the incident could be properly assessed. Operations would remain suspended for over two weeks and did not resume until around October 4, 2016.

49.     The news sparked a fresh round of protests from residents of the town of Jáchal. The Asamblea Jáchal No Se Toca, a local Barrick Gold protest group, released a statement stating: "We are disgusted by this recurring disaster, just one year after what diverse professionals have called the country's worst ever environmental disaster related to mining activity. It is embarrassing that this situation is being repeated in the same place just one year later."

50.     CW1 questions the truth of Barrick Gold's statements regarding the cause of the September 8, 2016 spill. CW1 did not believe that a block of ice could have caused the pipeline rupture, because in 15 years of working at Veladero, CW1 never saw a moving block of ice capable of breaking a pipeline. "I know the place where it happened," CW1 said, "I know the pipeline, I know the type of failure, and it was something that had happened before [at Veladero], just not at the same magnitude." CW1 recalled a similar rupture occurring in 2014, but said that the incident in September 2016 was made worse but not detecting it as quickly.

51.     On September 22, 2016, the Environment Ministry presented a complaint to the San Juan provincial judiciary requesting a criminal investigation into the latest cyanide-solution leak. Minister Sergio Bergman noted that the "complaint was submitted because [Barrick Gold] did not comply with protocol. The accident occurred on September 8 and was disclosed on September 12, and so there is a window of presumption that it did not act on the leak as required

by law. The judiciary must decide whether there was fraud or negligence." Bergman would later say that Barrick Gold "had been managing with levels of uncontrolled immunity and unacceptable impunity," warning that it had to prepare for a "closure scenario of the mine."[6]

### The Start of the Class Period and Barrick Gold's Third Spill in 18 Months

52.     On February 16, 2017, the start of the Class Period, Barrick Gold held its fourth quarter 2016 and year-end results conference call with analysts, during which Defendants Dushnisky, Williams, Raw, and Palmes all spoke publicly about the previous year's financial and operational results. Defendant Palmes, the senior executive responsible for overseeing the Veladero mine, spoke specifically about challenges presented by the suspension of operations due to the September 8, 2016 spill and how the Company took measures to prevent another such incident:

> At Veladero, 2016 was a very challenging year. In Q2, severe winter-related [sic] resulted in 42 days of lost production. In Q3, production was impacted by the two weeks suspension of an operation due to environmental incident quickly followed by a recovery action plan in Q4. ***We previously completed a series of remedial works to prevent such an incident from occurring again***, including the deployment of unmanned aerial vehicles for remote sensing.

 [Emphasis added].

53.     But less than six weeks after issuing this statement, on March 28, 2017, a pipe failure led to the third cyanide solution spill at Veladero in 18 months. According to a Barrick Gold statement issued the following day, "the monitoring system at Veladero detected a rupture on a pipe carrying gold-bearing solution on the leach pad." Per their usual damage control response, the Company downplayed the significance of the spill, stating that "[p]rocedures were

---

[6] Quotation translated from original Spanish from November 10, 2016 article entitled, "They denounce the Argentine State for violation of human and environmental rights in the Veladero mine," published in *La Nacion*, available at http://www.lanacion.com.ar/1955054-denuncian-al-estado-argentino-por-violacion-a-los-derechos-humanos-y-ambientales-en-la-mina-veladero.

immediately activated to contain and mitigate the situation, and the Company quickly corrected the issue….All solution was contained within the operating facility….There was no impact to people or the environment." Appearing on a local San Juan television program, the Veladero mine's General Manager stated that "the only important environmental accident, which was a spill, was the one from 2015 and it had no environmental consequences" and that "[w]hat happened last year, in contrast, was an extremely minor issue which was handled very poorly by the company."

54.     Contrary to the Company's statements, this was an "important environmental accident," and the incident demonstrated that the Company lied about performing remedial measures that could have prevented the spill. And it was not only Defendant Palmes (who professed first-hand knowledge of these purported remedial measures) that would have known that his statement was false when made, but all Barrick Gold executives would have also known about any such repairs.

55.     According to CW2, a former Senior Accountant at Barrick Gold who worked on the mining site of the Company's Cortez Mine in Crescent Valley, Nevada from 2009 through September 2016, Barrick Gold executives all had access to the Company's Oracle software, which included cost estimates for all of the Company's mining sites. As an accountant for Barrick Gold's Cortez Mine, CW2 tracked the mine's costs which were broken down into two categories – expense costs and capital costs. CW2 would input costs into a localized Oracle system for the Cortez mine, as would accountants for other mines. CW2 stated that senior executives could pull anything from the Oracle systems, including costs to expand heap leach facilities and replace ruptured pipes such as the ones at the Veladero mine in 2015, 2016 and 2017, because these expenditures and capital costs were all tracked on Oracle.

56.     On March 30, 2017, Barrick Gold issued a press release entitled "Barrick Reports Restrictions at Veladero Mine Heap Leach Facility," in which the Company announced "that the Government of San Juan Province, Argentina, has temporarily restricted the addition of cyanide to the Veladero mine's heap leach facility pending the verification that remedial works have been completed." Nevertheless, the press release concluded that "we do not anticipate a material impact to Veladero's 2017 production guidance."

57.     On April 6, 2017, according to articles by *Reuters* and *The Globe and Mail*, Barrick Gold executives, including Defendants Dushnisky, Williams, and Raw, met with local managers and national and provincial officials in Argentina who told the Company that its ongoing business in the country was in the balance. Specifically, Mining Minister Juan Jose Aranguren explained to *Reuters* that "[w]e have told the company to change their standards and invest, modify the project's engineering to ensure these incidents never happen again," and that the company's concession to operate the mine would have been at risk if Barrick Gold had not agreed to an external audit. A statement from the San Juan government said that Barrick Gold's work plan should include "the complete re-engineering of the operational and environmental processes and standards of the Veladero enterprise."

58.     The Company also announced on April 6, 2017 that it would sell 50% of the Veladero mine to Shandong Gold Mining Co., Ltd. ("Shandong") for $960 million and, as part of the announcement, reiterated Barrick Gold's belief that the cyanide usage restrictions would not impact gold production at Veladero. Additionally, Barrick Gold and Shandong would be submitting a plan to the government of San Juan province to make $500 million worth of necessary upgrades on the mine to prevent future spills, which include adding containment barriers, strengthening and moving pipes, and adding cameras to monitor the area.

59.     But then on April 24, 2017, Barrick Gold issued a press release announcing the Company's first quarter 2017 financial results, in which the Company finally revealed the material financial impact of their Veladero failures. The press release revealed, in relevant part, that the Company's gold production expectations for Veladero had fallen over 18% from 770,000-830,000 ounces to 630,000-730,000 ounces. The news surprised analysts and investors whom Defendants had led to believe Veladero's production had not been impacted by the March 28, 2017 spill. As a result of the foregoing disclosure, Barrick Gold's stock plummeted from $19.04 per share at close on April 24, 2017 to $16.89 per share at close on April 25, 2017, a precipitous decline of over 11% on very high trading volume.

60.     Later, on May 8, 2017, an exclusive story from *Reuters* reported that Barrick Gold faces sanctions for the March 28, 2017 cyanide spill. Judge Oritja told *Reuters* that the Company missed deadlines on three orders from local authorities, including the replacement of pipes, prior to the spill. The orders were given in December 2016 and February 2017, and involved fixing Veladero's pipe system according to a San Juan government source. Judge Oritja also stated that he had met with the head of the mining police in western Argentina's San Juan province on May 5, 2017, and learned that "if they had changed the pipes as ordered, the decoupling [of pipes that led to the spill] would not have occurred." Relatedly, San Juan province Mining Minister Alberto Hensel stated that Barrack Gold failed to complete an "urgent review" of the pipe system before the third spill. Thus, contrary to statements made by Barrick Gold and Defendant Palmes, the Company had not performed the necessary remedial works to prevent future incidents and, indeed, failed to complete the very work and "urgent review" that local authorities ordered them to perform, which directly resulted in the failures that led to the spill.

61.     Judge Oritja said that the findings "will eventually end in sanctions against the company," and Mining Minister Hensel stated that the repeated spills at Veladero could result in a higher fine than the previous $9.8 million fine related to the September 2015 incident.

62.     An article published by *El Economista* on May 8, 2017, entitled "For Justice, Barrick Gold Acted 'Negligently' on the World's Largest Gold Mine," further reported on the incident, noting that "[t]he judge investigating the latest incident in late March and an official in San Juan province, where Veladero is, said that after the second spill in September 2016 the company ignored warnings about the risks of another incident."[7] Moreover, the article reported that "[a] source from the provincial mining ministry who preferred anonymity said that in the past Barrick executives and even provincial government officials ignored warnings from employees of Veladero and the mining police who were aware of the infrastructure problems that led to previous spills."

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

63.     On February 16, 2017, the beginning of the Class Period, Barrick Gold held a conference call with analysts to discuss its fourth quarter and year-end 2016 fiscal year financial results. During the call, Defendant Palmes, the senior executive responsible for overseeing the Veladero mine, stated, in relevant part:

> At Veladero, 2016 was a very challenging year. In Q2, severe winter-related [sic] resulted in 42 days of lost production. In Q3, production was impacted by the two weeks suspension of an operation due to environmental incident quickly followed by a recovery action plan in Q4. ***We previously completed a series of remedial works to prevent such an incident from occurring again***, including the deployment of unmanned aerial vehicles for remote sensing.

---

[7]     Excerpts of article translated from their original Spanish. Original article can be found at http://www.eleconomistaamerica.com.ar/empresas-eAm-argentina/noticias/8343359/05/17/Para-la-Justicia-Barrick-Gold-actuo-con-negligencia-en-la-mayor-mayor-minera-aurifera-del-mundo.html.

[Emphasis added].

64.     The foregoing statement was materially false and misleading because Barrick Gold did not, in fact, *"complete[] a series of remedial works to prevent such an incident from occurring again*." Shortly after Defendant Palmes made this statement on March 28, 2017, the Company experienced another such cyanide solution spill at Veladero. Moreover, according to statements made by Judge Ortija, who had spoken with local mining police, Barrack Gold had flouted orders and missed deadlines to complete remedial works on the mine's piping system that would have prevented the very pipe decoupling that resulted in the March 28, 2017 spill. An employee from the provincial mining ministry also maintained that Barrick Gold executives ignored warnings from employees at Veladero and the mining police who were aware of infrastructure problems that led to previous spills.

65.     On March 30, 2017, Barrick Gold issued a press release entitled, "Barrick Reports Restrictions at Veladero Mine Heap Leach Facility." Therein, the Company stated:

> Barrick Gold Corporation…today reported that the Government of San Juan province, Argentina, has temporarily restricted the addition of cyanide to the Veladero mine's heap leach facility pending the verification that remedial works have been completed. The Company is working to complete this remediation as quickly as possible.
>
> On the evening of March 28, the monitoring system at Veladero detected a rupture of a pipe carrying gold-bearing solution on the leach pad. All solution was contained within the operating site; no solution reached any diversion channels or watercourses. The Company promptly notified San Juan provincial authorities, who inspected the site on March 29.
>
> The safety of people and the environment remains Barrick's top priority. The incident did not pose any threat to the health of employees, communities, or the environment.
>
> *At this time, we do not anticipate a material impact to Veladero's 2017 production guidance.*

21

[Emphasis added].

66.     The foregoing statements were materially false and misleading when made because Barrick Gold knew, or was reckless in not knowing, that the March 28, 2017 incident would have a "material impact to Veladero's 2017 production guidance." The Company's spokesman acknowledged that the inability to add fresh cyanide to process gold would impact production, stating that "[a]s the existing solution circulates and loses potency, the amount of gold recovered will decline." CW1 also stated that the inability to add fresh cyanide to the leach circuit decreased efficiency and lowered production. Moreover, cyanide usage restrictions put into place in connection with spills in 2015 and 2016 materially impacted production at Veladero. Barrick Gold was also aware that the Company had not complied with previous orders to remediate pipeline issues, and would have to fix all those issues prior to the San Juan Government lifting restrictions at Veladero, and the longer restrictions were in place, the larger the impact would be on Veladero's gold production.

67.     Analysts following Barrick Gold took the Company at its word, and as a result, did not downgrade the stock. For example, in a March 30, 2017 report, RBC Capital Markets stated the following with a sentiment indicator of "neutral":

> According to a press release issued by Barrick yesterday evening, at the Veladero mine in Argentina "on the evening of March 28, the monitoring system at Veladero immediately detected a rupture of pipes carrying gold-bearing solution on the leach pad". The company stated that the solution was contained within the operating facility, there was no impact to people or the environment, and the local authorities had been notified of the incident. This news follows similar issues in September 2016 and September 2015, when operations at Veladero were temporarily suspended by the authorities due to gold-bearing cyanide solution leaks. ***While we view this latest issue as a slight negative for Barrick's shares, the company has stated that there has been no impact on production at this time.***

[Emphasis added].

68.     On April 6, 2017, Barrick Gold issued a press release entitled, "Barrick Announces Strategic Cooperation Agreement with Shandong Gold," in which the Company described the details of the deal that would give Shandong Gold a 50 percent share of Veladero for $960 million. In the press release, Barrick Gold reaffirmed its gold production guidance for Veladero, stating: "The mine is expected to produce 770,000-830,000 ounces of gold in 2017, at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce."

69.     The foregoing statement was materially false and misleading when made because Veladero's gold production had already been and would continue to be hindered by restrictions placed on the mine by the San Juan Government, such that the Company's pre-spill projections were already materially impacted. Thus, Barrick Gold knew or was reckless in not knowing that the Company's reaffirmed "770,000-830,000" ounce production projection was materially overstated.

## VI.    THE TRUTH EMERGES

70.     On March 28-29, 2017, the truth underlying Barrick Gold's materially false and misleading statements was partially revealed when, on March 28, 2017, a pipe carrying cyanide solution ruptured at the Veladero mine. The following day, the Company issued a statement disclosing the following:

> SAN JUAN, Argentina – Barrick confirms that on the evening of March 28, the monitoring system at Veladero detected a pipe carrying gold-bearing solution on the leach pad.
>
> Procedures were immediately activated to contain and mitigate the situation, and the Company quickly corrected the issue. At the same time, the Company shared this information with San Juan provincial authorities.
>
> All solution was contained within the operating facility.

There was no impact to people or the environment.

71.     The March 28-29, 2017 disclosure revealed that, contrary to Barrick Gold's previous material misrepresentations, the Company did not complete such works to prevent another cyanide solution spill at Veladero. As a result of this disclosure, between March 27, 2017 and March 30, 2017, the price of Barrick Gold's stock decreased from $19.62 per share to $18.84 per share on higher than average trading volume.

72.     In a report dated March 31, 2017, BMO Capital Markets published a report entitled "Oops, Veladero Restrictions (Again)," in which analyst Andrew Kaip, who follows Barrick Gold, stated "[t]his is the third incident in roughly 18 months and *stands in contrast to the numerous positive initiatives that the company has executed over the last three years.*" [Emphasis added].

73.     Defendants mitigated the decline in stock price by issuing materially misleading statements downplaying the severity of the spill and reaffirming gold production guidance for the Veladero mine over the next month.

74.     It was not until April 24, 2017, when the full truth underlying Defendants' materially false and misleading statements came to be revealed in a Barrick Gold press release announcing the Company's first quarter 2017 financial results. The press release revealed, in relevant part:

**Veladero Update**

On March 28, a coupling on a pipe carrying gold-bearing solution at the Veladero mine heap leach facility failed. Solution released from the rupture was contained within the operating site and did not result in any impact to the environment or people. The Company promptly notified San Juan provincial authorities, who inspected the site on March 29. On March 30, the Government of San Juan province temporarily restricted the addition of cyanide to the Veladero mine's

24

heap leach facility, pending the completion of works to strengthen and improve the mine's operating systems.

Barrick presented its proposed work plan to San Juan provincial authorities on April 21, following extensive consultation with both federal and provincial officials and regulators. The provincial government has indicated it will take approximately two weeks to review the Company's proposals, a process that will also include federal authorities, including the national Ministry of Environment and Sustainable Development. Initial work on the proposed modifications to the heap leach facility has already begun, concurrent with the review by provincial and federal authorities. Our updated guidance assumes a resumption of normal leaching activities at the mine in June, subject to approval by the Government of San Juan province, the lifting of operating restrictions by the San Juan provincial court, and the resolution of regulatory and legal matters by the federal and provincial courts (for more information about these matters, please see Note 17 "Contingencies" of Barrick's first quarter financial statements and the notes thereto). This assumption is based on our assessment of the time required to complete the proposed modifications to the leach pad. The timing of approval for the resumption of leaching activities will depend on the actual progress of work, any potential new requirements, and a final evaluation of the completed modifications by provincial authorities. In parallel with the submission of a new technical plan for the operation, Barrick has also presented an updated community investment and engagement plan to the Government of San Juan and federal authorities for review.

***On a 100 percent basis, we now expect full-year production at Veladero of 630,000-730,000 ounces of gold, at a cost of sales of $740-$790 per ounce, and all-in sustaining costs of $890-$990 per ounce.*** Barrick's share of full-year production, assuming 50 percent ownership from July 1, is expected to be 430,000-480,000 ounces of gold. This compares to our original 2017 guidance of 770,000-830,000 ounces (100 percent basis), at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce.

[Emphasis added].

75.     The April 24, 2017 press release revealed the truth underlying Defendants' material misrepresentations and omissions regarding remedial efforts performed at Veladero and the impact of the March 28, 2017 spill on gold production and Barrick Gold's financial position. Specifically, the spill resulted in an over 18% decrease in production at Veladero, a material amount for one of the Company's largest and most profitable mines. As a result of the foregoing disclosure, Barrick Gold's stock plummeted from $19.04 per share at close on April

24, 2017 to $16.89 per share at close on April 25, 2017, a precipitous decline of over 11% on very high trading volume.

76.     Analysts expressed surprise at the impact of the March 28, 2017 Veladero spill, which they were led to believe would not have a material impact on Barrick Gold's financial results.

77.     For example, RBC Capital Markets explained in an April 24, 2017 report that Barrick Gold had led them to expect higher production numbers from Veladero. Specifically, the report stated that "ABX reduced 2017 guidance by ~300koz (greater than our anticipated ~200koz)" saying that while "[t]he ~200koz reduction related to the Veladero sale was in line with our estimate," they were not expecting "the balance relat[ing] to regulatory restrictions on leaching at Veladero following the March 28 cyanide leak."

78.     BMO Capital Markets echoed these sentiments on April 24, 2017, noting that "[t]he reduction in guidance is primarily attributable to Veladero, where the company has reduced guidance (100% basis) to 630-730koz (was 770-830koz at AISC of $840-940/oz) with higher costs due to the impact of the announced shutdown."

79.     That same day, Scotiabank also reported that Barrick Gold announced "Surprisingly Weak Operating Results; Veladero Environment Issues in Focus," explaining that ABX has had to reduce 2017 production guidance at Veladero by 100-140oz (100% basis) due to the failure of the coupling pipe carrying gold bearing solution." Deutsche Bank also published a report on April 24, 2017 entitled "1Q17 results: Weaker production Veladero yet to be fully resolved."

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

80.     Numerous additional facts support the strong inference that Defendants made materially false and misleading statements and omissions, at minimum, with reckless disregard for the truth.

81.     First, Defendant Palmes' statement during the February 16, 2017 conference call with analysts that Barrick Gold *"previously completed a series of remedial works to prevent such an incident from occurring again*," was made with scienter because Defendant Palmes professed knowledge of the very information that is alleged herein to have been materially false and/or misleadingly conveyed to the market. Specifically, that Barrick Gold did not, in fact, complete those remedial works, because shortly after making this statement on March 28, 2017, the Company experienced another such cyanide solution spill. Furthermore, Judge Oritja stated that the Company missed deadlines on three orders from local authorities to replace pipes prior to the spill and that, "if they had changed the pipes as ordered, the decoupling [of pipes that led to the spill] would not have occurred." According to an article in *El Economista* on May 8, 2017, entitled, "For Justice, Barrick Gold Acted 'Negligently' on the World's Largest Gold Mine," an employee from the provincial mining ministry also maintained that Barrick Gold executives ignored warnings from employees of Veladero and the mining police who were aware of infrastructure problems that led to previous spills. In other words, either Defendant Palmes had the knowledge he professed to have, in which case his statement was knowingly false or misleading when made; or, he did not have such knowledge, and was therefore, at the very least, reckless in making that statement to the investing public without proper basis. Either way, his conduct supports a finding of scienter.

27

82.     Furthermore, as explained by CW2, all senior executives had access to Veladero's expenditures and capital costs, such as those to expand heap leach facilities and replace ruptured and faulty pipes, through the Company's Oracle system, and would have known whether those remedial steps were taken. Given that Barrick Gold and Shandong ultimately submitted a plan to the government of San Juan province to make ***$500 million*** worth of necessary upgrades to prevent future spills, Defendants either knew or were reckless in not knowing that such necessary upgrades had not been previously performed.

83.     Second, Defendants' repeatedly publicized misinformation regarding spills at the Veladero mine support the inference that Defendants' Class Period false and misleading statements were made with the requisite scienter. With regard to the September 13, 2015 spill, Barrick Gold misled the public regarding the size and scope of the spill, stating that "[i]n light of a series of unfounded statements, Barrick would like to inform that there was no contamination of the rivers in the Jáchal basin," when, in fact, as much as 3,000,000 liters of cyanide containing solution spilled into at least three different rivers including the Las Taguas and the Potrerillos. As for the September 8, 2016 spill, Barrick Gold did not even disclose the incident for a full week, and reportedly would not have disclosed it but for a Barrick Gold employee blowing the whistle on the Company. Moreover, CW1 explains that the pipe rupture was not likely caused by a block of ice, like the Company eventually stated, because there were no large blocks of moving ice in that area. Indeed, CW1 stated that the exact same type of rupture had occurred before.

84.     Third, the Individual Defendants, and specifically Defendant Dushnisky, received daily production updates from the Veladero mine, and therefore knew that the Company's production guidance was false and misleading; or, at the very least were reckless in maintaining such guidance when they knew production was hindered by restrictions placed on the mine by

the local government. Indeed, CW1 not only describes in detail how daily production numbers were reported, but also describes a systemic pattern of Barrick Gold executives knowing about incidents negatively impacting production and yet maintaining production guidance. Given that Defendants knew that processing restrictions, and particularly cyanide usage restrictions, hindered production, and knew that previous spills had caused the local government to put such restrictions on Veladero, Defendants were, at the very least, reckless in maintaining production guidance following the March 28, 2017 spill.

85.     Fourth, the Veladero mine is one of Barrick Gold's five largest mines, which collectively account for 70% of the Company's gold production, and Defendants would have been acutely aware of operations at the mine and its gold production statistics. Moreover, because of the global newsworthiness of the September 2015 spill, which was the largest of its kind in Argentina's history, and local and national protests regarding the Company's safety and environmental concerns at the mine, Defendants would have been particularly sensitive to information regarding repairs, cyanide usage restrictions, and production guidance at Veladero.

86.     Defendants acted with scienter in that each Defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and, knowingly or recklessly disregarded, and/or substantially participated or acquiesced in, the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants participated in the fraudulent scheme alleged by virtue of their receipt of information reflecting the true facts regarding Barrick Gold, their control over the Company's alleged materially misleading misstatements, and/or their associations with the

Company, which make them privy to confidential proprietary information concerning Barrick Gold and the Company's business and operations.

## VIII.   LOSS CAUSATION / ECONOMIC LOSS

87.     During the Class Period, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the price of Barrick Gold's securities and operated as a fraud on Class Period purchasers of Barrick Gold stock by issuing materially false and misleading statements and omissions related to the Company's completion of remedial measures at the Veladero mine and the impact of the March 28, 2017 pipe rupture incident on Barrick Gold's gold production. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors, the value of Barrick Gold securities declined precipitously – evidence that the prior artificial inflation in the price of Barrick Gold's stock was eradicated. As a result of their purchases of Barrick Gold securities during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic losses when the truth regarding the collusive scheme and Barrick Gold's true business operations was finally revealed and the artificial inflation was removed from price of the Company's stock, *i.e.*, damages under the federal securities laws.

88.     Two partial disclosures revealed to the market the false and misleading character of Defendants' statements and omissions. First, on March 28-29, 2017, the truth underlying Barrick Gold's materially false and misleading statements regarding the completion of remedial works was partially revealed when, on March 28, 2017, a pipe carrying cyanide solution ruptured at the Veladero mine. As a result of this disclosure, between March 27, 2017 and March 30, 2017, the price of Barrick Gold's stock decreased from $19.62 per share to $18.84 per share on higher than average trading volume. However, this disclosure did not reveal the full truth, as

Defendants continued to mislead the market regarding the scope and impact of the spill by reaffirming gold production guidance for the Veladero mine over the next month.

89.    The truth underlying Defendants' materially false and misleading statements was fully revealed on April 24, 2017, when Barrick Gold issued press release announcing the Company's first quarter 2017 financial results, in which the Company drastically scaled back gold production estimates on account of disruptions at Veladero. Investors were surprised at the impact of the March 28, 2017 Veladero spill, which they were led by Defendants to believe would not have a material impact on Barrick Gold's financial results. As a result of disclosure, Barrick Gold's stock plummeted from $19.04 per share at close on April 24, 2017 to $16.89 per share at close on April 25, 2017, a precipitous decline of over 11% on very high trading volume.

90.    The foregoing disclosures of true, undisclosed facts concerning Barrick Gold's mining operations and gold production at Veladero caused substantial losses to investors, with the value of Barrick Gold's securities falling precipitously. The decline in the price of Barrick Gold's stock at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of the price drop of Barrick Gold's stock negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraud.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

91.    Throughout the Class Period, the market for Barrick Gold stock was an efficient market for the following reasons, among others:

a.    Barrick Gold securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market, throughout the Class Period;

b.      As a regulated issuer, Barrick Gold filed periodic public reports with the SEC and the NYSE;

c.      Barrick Gold securities were followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

d.      Barrick Gold regularly issued press releases, which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

92.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.     PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

93.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Barrick Gold who knew that those statements were false when made.

## XI.   CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired shares of Barrick Gold common stock between February 16, 2017 and April 24, 2017, inclusive, in the United States or on a United States-based stock exchange and who were damaged when the truth regarding Barrick Gold's Veladero mine and related financial condition was revealed to the public removing the artificial inflation from the value of Barrick Gold's common stock that had accumulated from Defendants' materially false and misleading statements. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

95.     The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, Barrick Gold common stock was actively traded on an American stock exchange, the NYSE. As of February 14, 2017, the Company had approximately 1.17 billion shares of common stock issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Barrick Gold or its transfer agent and may be notified of the pendency of this action by mail and publication, using the forms of notice similar to those customarily used in securities class

actions.

96.     Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and all members of the Class were similarly affected by Defendants' conduct in violation of the federal securities laws that is complained of herein.

97.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. A class-wide proceeding will generate common answers to the following questions of law and fact common to the Class, among others:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether Defendants made materially untrue and/or misleading statements/omissions during the Class Period; and

(c) whether the members of the Class have sustained damages and the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action. Plaintiff's allegations stem from Defendants' issuance of materially false and/or

misleading statements and omissions during the Class Period contained in SEC filings, Company releases, and conference calls with analysts. These statements and omissions concealed true, adverse facts about, *inter alia*, Barrick Gold's Veladero mine and the Company's financial prospects.

## XII.   COUNT I: Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder

100.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

102.     Plaintiffs assert Section 10(b) and Rule 10b-5(a), (b) and (c) claims against all Defendants.

103.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock. Such a scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Barrick Gold common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Barrick Gold common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

104.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Barrick Gold common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Barrick Gold's finances and business prospects related to the Veladero mine.

105.     As established by the facts alleged above in ¶¶29-62, 80-86, as well as by virtue of their positions at Barrick Gold, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such

facts were readily available to Defendants. Additional information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

106.    Barrick Gold is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior.*

107.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Barrick Gold. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Barrick Gold's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Barrick Gold common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Barrick Gold's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Barrick Gold common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

108.    During the Class Period, Barrick Gold common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Barrick Gold common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Barrick Gold common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Barrick Gold common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

109.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

110.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

111.     This action was filed within two years of discovery of Plaintiff's claims, including discovery of the facts necessary to allege that Defendants acted with scienter, and within five years of the purchase on which such claims are based.

### XIII. COUNT II: Violations of Section 20(a) of the Exchange Act Against Individual Defendants

112.     Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

113.    During the Class Period, the Individual Defendants directed the daily operation and management of Barrick Gold, and directed the financial disclosures and statements to investors regarding, *inter alia*, Barrick Gold's operations at the Veladero mine and their impact on the Company's finances.

114.    As described above, the Individual Defendants knew the adverse non-public information about Barrick Gold alleged herein.

115.    As officers and, in the case of Defendant Dushnisky, directors, of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Barrick Gold's business operations, financial condition and prospects, and to correct promptly any public statements issued by Barrick Gold which had become materially false or misleading.

116.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Barrick Gold disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Barrick Gold to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Barrick Gold within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Barrick Gold common stock.

117.    Each of the Individual Defendants, therefore, acted as a controlling person of Barrick Gold, and by reason of the above conduct, is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Barrick Gold.

## XIV.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives and Lead Counsel as Class Counsel pursuant to Rule 23(g);

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XV.   **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: December 4, 2017

Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

/s/ Kim E. Miller
Kim E. Miller (KM-6996)
J. Ryan Lopatka
250 Park Ave., Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

-and-

Lewis S. Kahn
Matthew Woodard
206 Covington St.
Madisonville, LA 70447

Telephone: (504) 455-1400
Fax: (504) 455-1498

*Counsel for Lead Plaintiff Ashwini Malhotra
and Lead Counsel for the Class*

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt
Adam M. Apton
30 Broad Street
24th Floor
New York, NY 10004
Telephone: (212) 363-7500
Fax: (212) 363-7171

*Counsel for Additional Plaintiff BKW Living
Trust*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on December 4, 2017.

/s/ Kim E. Miller

Kim E. Miller
