UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

**MEMORANDUM AND ORDER**

In re BARRICK GOLD CORPORATION
SECURITIES LITIGATION                    17 Civ. 3507 (NRB)


------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


This action is not an environmental regulatory proceeding or an environmental tort suit. Rather, it is a federal securities class action filed on behalf of all persons and entities that purchased or otherwise acquired shares of the common stock of defendant Barrick Gold Corp. in the United States or on a U.S.-based stock exchange between February 16, 2017, and April 24, 2017, inclusive (the "Class Period"). Plaintiffs[1] allege that Barrick and four individual defendants, Kelvin Dushnisky, Catherine Raw, Richard Williams, and Jorge Palmes, violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Before the Court is defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted.

---

[1] We consolidated the related case <u>Kim v. Barrick Gold Corp.</u>, No. 17 Civ. 3815 (NRB) (S.D.N.Y. filed May 19, 2017), and appointed Ashwini Malhotra as lead plaintiff and Kahn Swick & Foti, LLC as lead counsel. <u>See</u> Oct. 4, 2017 Order, ECF No. 43.

## I.  Background

The following allegations are drawn from plaintiffs' amended complaint ("AC") [ECF No. 45], and are assumed to be true for the purposes of this motion.  See Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006).  We also consider any "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with [he [Securities and Exchange Commission ("SEC")], and documents possessed by or known to the plaintiffs and upon which they relied" in bringing this action.[2]  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

### A.  Factual Background

#### 1.  Barrick Gold and the Veladero Mine

Barrick Gold Corporation, based in Toronto, is the largest gold mining company in the world.  AC ¶ 23.  Its common stock trades on the New York Stock Exchange (NYSE) under the ticker ABX.[3] AC ¶ 23.  As part of its gold mining business, Barrick operates a

---

[2] In particular, we consider: (1) Barrick's September 25, 2015 press release, Declaration of Ada Fernandez Johnson ex. 1, Feb. 2, 2017, ECF No. 50-1; (2) Barrick's September 15, 2016 press release, id. ex. 2, ECF No. 50-2; (3) Barrick's October 4, 2016 press release, id. ex. 5, ECF No. 50-5; (4) a transcript of a February 16, 2017 conference call, id. ex. 6, ECF No. 50-6; (5) Barrick's March 29, 2017 press release, Letter from Kim E. Miller to the Court, Aug. 27, 2017, ECF No. 58-1; (6) Barrick's March 30, 2017 press release, Fernandez Johnson Decl. ex. 8, ECF No. 50-8; (7) Barrick's April 6, 2017 press release, id. ex. 9, ECF No. 50-9; and (8) Barrick's April 24, 2017 press release, id. ex. 10, ECF No. 50-10.

[3] Barrick also trades on the Toronto Stock Exchange, though the parties agree that only transactions in the United States or on U.S.-based exchanges (i.e., those on the NYSE) are the subject of this suit.  See generally Morrison v. Nat'l Austl. Bank, Ltd., 561 U.S. 247 (2010).

number of mines, including the Veladero mine in San Juan province, Argentina. AC ¶¶ 29, 31. Four Barrick employees are of particular relevance here and are named as individual defendants: (1) Kelvin Dushnisky, Barrick's President and Director during the Class Period; (2) Catherine Raw, Barrick's CFO and Executive Vice President during the Class Period; (3) Richard Williams, Barrick's COO during the Class Period, and (4) Jorge Palmes, the Barrick Executive General Manager overseeing the Veladero mine. AC ¶¶ 24–27.

The Veladero mine was opened in 2005 and is located on the Argentine side of the Andes Mountains at an elevation of 4,000 to 4,850 meters above sea level (approximately 13,000 to 16,000 feet). AC ¶ 31. Veladero is a strip mine, at which gold is extracted through the following process: First, ore is extracted from an open pit. AC ¶ 31. Second, the ore is crushed and transported by conveyor to a "leach pad." AC ¶ 32. Third, gold is "leached," i.e., extracted, from the ore in the leach pad area through a series of chemical processes known as gold cyanidation, where a cyanide-based solution is poured over the crushed ore in order to separate the gold from other materials. AC ¶ 32. Finally, the gold is then formed into semi-pure alloy bars, also known as doré bars, which are then transported to a refinery for further processing. AC ¶ 32. Barrick estimated that as of December 31, 2016, the Veladero mine contained 3.3 million ounces of "measured

and indicated gold resources" and 6.7 million ounces in "proven and provable gold reserves."[4]

According to a confidential witness CW1, who worked for Barrick between February 2001 and February 2016 and was the Process Chief at Veladero in September 2015, Barrick and the Veladero mine had a culture of focusing on and maintaining production targets. AC ¶¶ 45-46. CW1 was required to report daily production numbers to corporate headquarters in Toronto (and Dushnisky in particular) and would be required to explain what remedial steps were being taken when production was below target. AC ¶¶ 45, 84. When accidents and incidents occurred, Barrick focused on maintaining production and "would just push employees to try and recuperate the lost production." AC ¶ 46.

### 2. Prior Incidents at Veladero

Veladero experienced two incidents involving spills of cyanide solution in September 2015 and September 2016.[5] On September 13, 2015, a valve on a pipeline in the leach pad failed, resulting in the spill of solution from the leach pad. AC ¶ 34. CW1, the Veladero process chief at the time, AC ¶ 35, recalled the

---

[4] Plaintiffs allege that Barrick estimated that Veladero had 3.3 million ounces of "proven and provable" gold reserves. See AC ¶ 33. However, Barrick's public filings report the figures presented here. E.g., Fernandez Johnson Decl. ex. 9 at 3.

[5] We distinguish here a "leak" from a "spill." Plaintiffs' allegations suggest that solution can leak from pipes while remaining contained within the leach pad, and that sufficient solution must accumulate before leaked solution spills from the pad. E.g., AC ¶ 37 ("The solution began to accumulate, and then overflowed." (emphasis added)); see also AC ¶ 50 ("[CW1] said that the incident in September 2016 was made worse but not detecting it as quickly.").

4

incident as occurring in an expansion area of the mine, AC ¶ 37. According to CW1, the "monitoring instruments at the mine were not precise enough to detect the extra flow of cyanide solution that the broken valve allowed into the heap leach," which allowed the solution to accumulate and then overflow. AC ¶ 37.

Shortly thereafter, a Barrick employee at Veladero informed local residents of the spill through a Whatsapp message, stating that in part that "Today there was a spill of 15,000 liters of cyanide and mercury in Veladero directly into the river" and instructing message recipients to "not use water from the tap to drink, cook, etc." AC ¶ 38. Barrick, by contrast, issued a statement the next day, September 14, characterizing the spill as a small leak and denying that solution had contaminated the river or local water supplies. AC ¶ 39. The San Juan provincial government weighed in the next day, September 15, warning residents to "avoid and/or limit consumption of water" from the river in question. AC ¶ 40.

One day later (3 days after the spill), September 16, Barrick acknowledged that cyanide solution had spilled into the Las Taguas River near Veladero. AC ¶ 41. Barrick technicians estimated that 224,000 liters of cyanide solution were spilled in the incident, but Barrick again denied any impact on the health of local residents. AC ¶ 41. An environmental emergency was declared in the local town of Jachal, and Judge Pablo Ortija of the Judicial

Court of Jachal ordered a five-day suspension of gold leaching at Veladero. AC ¶ 41. Barrick acknowledged one week later, on September 23, that the magnitude of the incident was greater than previously disclosed and that one million liters of solution had spilled into the Potrerillos River. AC ¶ 42.

On September 25, 2015, 12 days after the spill and 9 days after the suspension of production, Barrick announced that production restrictions imposed by the Argentine authorities had been lifted and that it expected no material impact on Veladero's 2015 production guidance. AC ¶ 44; Fernandez Johnson Decl. ex 1. CW1 explained, however, that restrictions on the introduction of additional cyanide reduces the efficiency of the leaching process and reduces production, and estimated that production was reduced by 10% on days in which Barrick was restricted from adding cyanide. AC ¶ 45.

On September 8, 2016, approximately one year after the September 2015 spill, Barrick experienced another spill of cyanide solution at Veladero. AC ¶ 47. Barrick disclosed the incident to provincial authorities four days later, on September 12, and issued a public statement on September 14. AC ¶¶ 48, 51. Barrick stated that the incident stemmed from the tailings pond and was "caused by a break in an 18" pipeline containing solution" that "occurred after the pipe was struck by a chunk of ice." AC ¶ 48. Barrick's statement reassured that cyanide solution did not contaminate

local water sources and stated that there was no impact on mining activity. AC ¶ 48. The governor of San Juan province, however, suspended operations at the mine that day. AC ¶ 48.[6] Production did not resume until October 4, 2016 -- 26 days after the initial spill and 20 days after production had been suspended. AC ¶ 48. Barrick announced the resumption of production that day, and noted in its press release that "[t]he company has completed a series of remedial works required by provincial authorities designed to prevent such an incident from reoccurring, including increasing the height of the perimeter berms that surround the leach pad." Fernandez Johnson Decl. ex. 5.[7] The company also reaffirmed its previously announced production guidance for 2016. Id.

### 3. Events During the Class Period

The Class Period begins on February 16, 2017, when Barrick held a conference call to discuss its results for the fourth quarter of 2016. AC ¶ 52; Fernandez Johnson Decl. ex. 6. After discussion by senior management (including defendants Dushnisky, Williams, and Raw, see Fernandez Johnson Decl. ex. 6 at 5-13), six location-specific General Managers discussed results for their

---

[6] Barrick's press releases announced the suspension of operations on September 15 rather than September 14, but any discrepancy is immaterial. See Fernandez Johnson Decl. exs. 2, 5.

[7] We note this press release not for the truth of the matter asserted (i.e., that Barrick in fact increased the height of the perimeter berms surrounding the leach pad), but to note what Barrick had previously disclosed to the public.

particular sites. These managers included defendant Palmes, who
stated the following:

> At Veladero, 2016 was a very challenging year. In Q2,
> severe winter-related [sic] resulted in 42 days of lost
> production. In Q3, production was impacted by the two
> weeks suspension of an operation due to environmental
> incident quickly followed by a recovery action plan in
> Q4. We previously completed a series of remedial works
> to prevent such an incident from occurring again,
> including the deployment of unmanned aerial vehicles for
> remote sensing.
>
> Looking forward, our digital transformation initiative
> at the Barrick's first integrated Remote Operations
> Centre will help us drive high returns. For 2017, we
> expect increased production of 770,000 ounces to 830,000
> ounces at all-in sustaining cost of $840 per ounce to
> $940 per ounce.

Fernandez Johnson Decl. ex. 6 at 15.

Approximately six weeks later, at approximately 5:00 p.m. on
March 28, 2017, Veladero experienced a leak of cyanide solution.[8]
AC ¶¶ 53, 70; Letter from Kim E. Miller to the Court, Aug. 27,
2018, ECF No. 59. Barrick issued a press release confirming the
leak on March 29, which stated the following:

> SAN JUAN, Argentina — Barrick confirms that on the
> evening of March 28, the monitoring system at Veladero
> detected a rupture on a pipe carrying gold-bearing
> solution on the leach pad.
>
> Procedures were immediately activated to contain and
> mitigate the situation, and the Company quickly
> corrected the issue. At the same time, the Company
> shared this information with San Juan provincial
> authorities.

---

[8] Plaintiffs characterize the leak as a "spill," e.g., AC ¶¶ 53, 71, 73,
but offer no allegations that any cyanide solution in fact left the leach pad
(as with the September 2015 and September 2016 spills).

> All solution was contained within the operating
> facility.

> There was no impact to people or the environment.

Letter from Kim E. Miller to the Court ex. A, Aug. 27, 2018, ECF
No. 59-1.

The next day, March 30, Barrick issued a second press release
discussing the March 28 incident. AC ¶ 56; Fernandez Johnson Decl.
ex. 8. This press release, titled "Barrick Reports Restrictions
at Veladero Mine Heap Leach Facility" stated:

> Barrick Gold Corporation . . . today reported that the
> Government of San Juan province, Argentina, has
> temporarily restricted the addition of cyanide to the
> Veladero mine's heap leach facility pending the
> verification that remedial works have been completed.
> The Company is working to complete this remediation as
> quickly as possible.

> On the evening of March 28, the monitoring system at
> Veladero detected a rupture of a pipe carrying gold-
> bearing solution on the leach pad. All solution was
> contained within the operating site; no solution reached
> any diversion channels or watercourses. The Company
> promptly notified San Juan provincial authorities, who
> inspected the site on March 29.

> The safety of people and the environment remains
> Barrick's top priority. The incident did not pose any
> threat to the health of employees, communities, or the
> environment.

> At this time, we do not anticipate a material impact to
> Veladero's 2017 production guidance.

Fernandez Johnson Dec. ex. 8 at 1.

The press release also contained a "Cautionary Statement on
Forward-Looking Information," which explained that "[k]nown and
unknown factors could cause actual results to differ materially

from those projected in the forward-looking statements and undue reliance should not be placed on such statements and information." The cautionary statement proceeded to identify a number of risk factors, including "failure to comply with environmental and health and safety laws and regulations," "timing of receipt of, or failure to comply with, necessary permits and approvals," "damage to the Company's reputation due to the actual or perceived occurrence of any number of events, including negative publicity with respect to the Company's handling of environmental matters or dealings with community groups, whether true or not," and "changes in national and local government legislation, taxation, controls or regulations and/or changes in the administration of laws, policies and practices." <u>Id.</u> at 2. The statement added further that "[m]any of these uncertainties and contingencies can affect our actual results and could cause actual results to differ materially from those expressed or implied in any forward-looking statements made by, or on behalf of, us." <u>Id.</u> at 3.

Despite the eventfulness of the period between March 28 and March 30, plaintiffs allege only that Barrick's stock price dropped from $19.62 per share on March 27 to $18.84 per share on March 30. AC ¶¶ 71, 88. We take judicial notice of the following changes of Barrick's stock prices[9]: On March 27, Barrick opened at $19.62 and

---

[9] See <u>ABX: Barrick Gold Corporation</u>, Yahoo! Finance (last accessed Sept. 17, 2018), https://finance.yahoo.com/quote/ABX/history?period1=1488344400

closed at $19.60.  On March 28, Barrick opened at $19.52 and closed at $19.08.  On March 29, Barrick opened at $19.00 and closed at $19.19.  On March 30, Barrick opened at $19.06 and closed at $18.84.

On April 6 -- one week later -- Barrick announced via press release that Shandong Gold Mining Co. would acquire a 50% interest in Veladero in exchange for $960 million.  AC ¶ 58; Fernandez Johnson Decl. ex. 9.  This press release described the Veladero mine as follows:

> The Veladero mine is located in the San Juan province of Argentina, on the highly prospective El Indo Belt, approximately 10 kilometers away from Barrick's Pascua-Lama project.  Veladero is located at elevations of between 4,000-4,850 meters above sea level, approximately 375 kilometers northwest of the city of San Juan.  As of December 31, 2016, the mine had proven and probable gold reserves of 6.7 million ounces, and measured and indicated gold resources of 3.3 million ounces.  <u>The mine is expected to produce 770,000-830,000 ounces of gold in 2017, at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce.</u>

Fernandez Johnson Decl. ex. 9 at 3 (emphasis added) (footnotes omitted).  This press release contained cautionary language identical to the language contained in the March 30 press release.

That same day, Barrick executives met with Argentine officials, who informed Barrick that its operations in the country were in jeopardy and that "the company's concession to operate the

---

&period2=1490932800&interval=1d&filter=history&frequency=1d.  Yahoo! Finance reports the same quotes for Barrick stock as those presented in plaintiffs' allegations, <u>e.g.</u>, AC ¶¶ 59, 71, 88-89.

mine would have been at risk if Barrick Gold had not agreed to an external audit." AC ¶ 57. Barrick and Shandong "would be submitting a plan to the government of San Juan province to make $500 million worth of necessary upgrades on the mine to prevent future spills." AC ¶ 58 (emphasis added).[10]

On April 24, 2017 -- the end of the Class Period and 27 days after the March 28 leak -- Barrick announced its First Quarter 2017 operating results. AC ¶¶ 59, 74; Fernandez Johnson Decl. ex. 10. The announcement provided further details about the situation at Veladero:

> On March 28, a coupling on a pipe carrying gold-bearing solution at the Veladero mine heap leach facility failed. Solution released from the rupture was contained within the operating site and did not result in any impact to the environment or people. The Company promptly notified San Juan provincial authorities, who inspected the site on March 29. On March 30, the Government of San Juan province temporarily restricted the addition of cyanide to the Veladero mine's heap leach facility, pending the completion of works to strengthen and improve the mine's operating systems.

> Barrick presented its proposed work plan to San Juan provincial authorities on April 21, following extensive consultation with both federal and provincial officials and regulators. The provincial government has indicated it will take approximately two weeks to review the Company's proposals, a process that will also include federal authorities, including the national Ministry of Environment and Sustainable Development. Initial work on the proposed modifications to the heap leach facility has already begun, concurrent with the review by provincial and federal authorities. Our updated

---

[10] By design or otherwise, plaintiffs' allegations could be construed suggest that this plan was submitted on April 6. However, plaintiffs' use of the language "would be submitting," coupled with the allegation in the initial complaint that this plan was submitted on April 21, see Compl. ¶ 28, ECF No. 1, renders implausible any suggestion that this plan was submitted on April 6.

guidance assumes a resumption of normal leaching activities at the mine in June, subject to approval by the Government of San Juan province, the lifting of operating restrictions by the San Juan provincial court, and the resolution of regulatory and legal matters by the federal and provincial courts (for more information about these matters, please see Note 17 "Contingencies" of Barrick's first quarter financial statements and the notes thereto). This assumption is based on our assessment of the time required to complete the proposed modifications to the leach pad. The timing of approval for the resumption of leaching activities will depend on the actual progress of work, any potential new requirements, and a final evaluation of the completed modifications by provincial authorities. In parallel with the submission of a new technical plan for the operation, Barrick has also presented an updated community investment and engagement plan to the Government of San Juan and federal authorities for review.

On a 100 percent basis [_i.e.,_ including the 50 percent attributable to Shandong Gold], we now expect full-year production at Veladero of 630,000-730,000 ounces of gold, at a cost of sales of $740-$790 per ounce, and all-in sustaining costs of $890-$990 per ounce. Barrick's share of full-year production, assuming 50 percent ownership from July 1, is expected to be 430,000-480,000 ounces of gold. This compares to our original 2017 guidance of 770,000-830,000 ounces (100 percent basis), at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce.

Fernandez Johnson Decl. ex. 10 at 4 (emphasis added) (footnote omitted).

This release also announced a number of other weak results on Barrick's part, including (1) increased all-in sustaining costs in the first quarter of 2017 as compared to 2016; (2) reduced production of copper at higher costs in the first quarter of 2017 as compared to 2016; and (3) reduced expectations for company-wide gold production in 2017, a "significant portion" of which was

attributable to the 50% sale of Veladero to Shandong Gold. <u>Id.</u> at 3. Barrick's stock dropped from $19.04 at market close on April 24, 2017 to $16.89 at market close on April 25. AC ¶¶ 75, 89.

### 4. Plaintiffs' Additional Allegations

In addition to the events before and during the Class Period, plaintiffs offer a number of additional allegations. First, Judge Ortija (of the Jachal Judicial Court) stated that Barrick had failed to comply with work orders issued in December 2016 and February 2017, AC ¶ 60, and that he learned on May 5, 2017 that the March 2017 leak would not have occurred had Barrick complied with an earlier order directing the replacement of certain pipes. AC ¶¶ 60, 81. Similarly, the provincial minister of mining stated that Barrick had failed to complete an "urgent review" of its pipe system. AC ¶ 60. Second, an additional confidential witness, CW2, a senior accountant at Barrick's Cortez mine in Nevada between 2009 and 2016, explained that the company maintained an accounting system through Oracle that tracked expense costs and capital costs. AC ¶ 55. CW2 further explained that "senior executives could pull anything from the Oracle systems," including costs spent on remedial works. AC ¶¶ 55, 82.

### B. Procedural History

The initial complaint in this action was filed with Shepard Broadfoot as a named plaintiff on May 10, 2017. <u>See</u> Compl., ECF No. 1. A separate case, captioned <u>Kim v. Barrick Gold Corp.</u>, No.

17 Civ. 3815, and identifying the same five defendants (Barrick and the four individual defendants named here), was also filed in this district, on May 19, 2017. After reviewing the four timely filed lead plaintiff applications as required by the Private Securities Litigation Reform Act (PSLRA), see 15 U.S.C. § 78u-4(a)(3)(B)(iii), we appointed Ashwini Malhotra as lead plaintiff, approved his counsel Kahn Swick & Foti, LLC as lead counsel, and consolidated the actions under this caption. See Oct. 4, 2017 Order, ECF No. 43. Plaintiffs then filed a substantially more detailed amended complaint, which remains operative. See AC, ECF No. 45. Defendants moved to dismiss on February 2, 2018, ECF No. 48, and oral argument was heard on August 23, 2018, see Aug. 23, 2018 Hr'g Tr., ECF No. 61.

## II. Discussion

### A. Legal Standards

On a motion to dismiss under Rule 12(b)(6), we must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. City of Providence v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017). Nevertheless, plaintiffs' "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). In addressing a motion to dismiss, a court

may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff[s] and upon which [they] relied in bringing the suit." ATSI, 493 F.3d at 98.

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). In order to state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must [plausibly allege] (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted).

Claims under section 10(b) must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see ATSI, 493 F.3d at 99. A complaint alleging securities fraud must also meet the

16

requirements imposed by the PSLRA, which requires that plaintiffs "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id.

The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." Id. § 78u-4(b)(2). In analyzing scienter, we assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007) (emphasis in original). "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 323-24. The inference must be more than merely reasonable or permissible; it must be "cogent and compelling," i.e., "strong in light of other explanations." Id. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference

of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

## B.   Section 10(b) and Rule 10b-5

Consistent with their obligations under the PSLRA, plaintiffs specifically identify three misleading statements: (1) Jorge Palmes's statement on the February 16, 2017 conference call describing the completion of remedial works, AC ¶¶ 63-64; (2) the statement in Barrick's March 30, 2017 press release that the company expected no material change to its 2017 production guidance, AC ¶¶ 65-67; and (3) the production guidance contained in the April 6, 2017 press release, AC ¶¶ 68-69.  We consider the February 16 statement first before turning to the March 30 and April 6 statements, for which the analysis is largely the same.

### 1.   Palmes's February 16, 2017 Statement

Plaintiffs first identify as misleading a portion of the statement that Palmes made during the February 16, 2017 conference call.  Palmes stated that:

> At Veladero, 2016 was a very challenging year.  In Q2, severe winter-related [sic] resulted in 42 days of lost production.  In Q3, production was impacted by the two weeks suspension of an operation due to environmental incident quickly followed by a recovery action plan in Q4.  We previously completed a series of remedial works to prevent such an incident from occurring again, including the deployment of unmanned aerial vehicles for remote sensing.

AC ¶ 52; Fernandez Johnson Decl. ex. 6 at 15 (emphasis added). We analyze both the falsity of this statement and whether it was made with scienter.

### a. Falsity

Plaintiffs do not plausibly plead that the statement was false or misleading. Plaintiffs contend that the statement was false because the March 2017 spill occurred shortly after Palmes's statement and because Barrick had in fact missed a number of work deadlines imposed by local authorities. AC ¶ 64. Defendants respond that Barrick had in fact completed various works intended to prevent further cyanide spills, including the deployment of monitoring drones[11] and the raising of perimeter berms surrounding the leach pad. Plaintiffs do not argue that these remedial actions were not in fact taken, or that the Argentine authorities had permitted the resumption of operations at Veladero in October 2016 following the completion of certain remedial works, cf. AC ¶ 48.

The occurrence of the March 2017 spill does not support an inference that Palmes's statement was false or misleading. "Fraud depends on the state of events when a statement is made, not on what happens later," In re Vivendi, S.A. Sec. Litig., 838 F.3d

---

[11] Plaintiffs fault defendants for failing to explain how monitoring drones can prevent a spill rather than identify a leak [Pls.' Opp'n 12 n.9], but plaintiffs' allegations support the proposition that prompt identification of a leak would allow Barrick to take action in order to prevent the accumulation of leaked solution that would then eventually overflow (i.e., a spill). E.g., AC ¶ 37; cf. AC ¶ 58 (referencing the addition of monitoring cameras as a spill-prevention measure).

223, 262 (2d Cir. 2016), and the falsity of Barrick's statement therefore depends on whether Barrick had, as of February 16, 2017, completed "a series of remedial works" intended to prevent further solution spills. Barrick either had done so or it had not as of that time, and what occurred afterwards -- including the March 28 spill -- is irrelevant. The March 28 spill at most indicates that, with the benefit of hindsight, Barrick could have taken further measures to prevent leaks and spills of cyanide solution, but "we have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.'" Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).

Perhaps recognizing this fundamental deficiency in their theory, plaintiffs repeatedly characterize Palmes's statement as a guarantee that no more spills of cyanide-containing solution would occur. E.g., Hr'g Tr. 27:19-20 (characterizing Palmes's statement as "we have completed these remedial works that will prevent another spill"); id. 34:15-16 (discussing "necessary work that would prevent the future spills"). Problematically for plaintiffs, however, Palmes did not say that Barrick had completed remedial works "that will prevent" or "that would prevent" an incident like the September 2016 spill from occurring. Rather, Palmes stated only that Barrick had completed remedial works "to prevent such an incident" occurring, and this phrasing cannot

reasonably be understood as a guarantee against all future spills of cyanide solution.[12]

Plaintiffs' second theory relies on three orders issued by local authorities in December 2016 and February 2017 directing the completion of certain works, AC ¶¶ 60, 81, but this theory relies on the same mischaracterization of Palmes's statement. One of these three orders -- plaintiffs do not specify which one -- directed the replacement of certain pipes at Veladero. AC ¶ 60. Assuming in plaintiffs' favor that these work orders in fact related to the September 2016 spill, the fact that Barrick did not complete certain remedial measures (even if required by local authorities) nonetheless does not mean that it did not complete certain other remedial measures (which could be fairly described as "a series"). Plaintiffs can argue (and the Argentine authorities can state) with the benefit of hindsight that compliance with those work orders would have prevented the March 2017 spill, but this chain of causation was hardly known ex ante before the spill, including the time Palmes's statement was made.

---

[12] Plaintiffs also rely on In re Barrick Gold Securities Litigation, No. 13 Civ. 3851 (SAS), 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015), which held that Barrick's "statements regarding environmental approvals" were actionable, id. at *11. In that case, Barrick had made a number of categorical representations that a certain project is "not impacting the glaciers surrounding our operations" and that "we're in compliance with our permits and we're in compliance with the provincial legislation," id., and the broad category of "statements regarding environmental approvals" were held to be actionable. While that case noted in a footnote that Barrick had represented that "[t]he company has put in place a range of measures to mitigate the potential impact of dust emissions on glaciers," id. at *11 n.141, it did not analyze specifically whether that particular representation was actionable.

Ultimately, plaintiffs' theories support at most an inference that Barrick could have, and very possibly should have, done more to prevent further leaks and spills of cyanide solution. But it does not plausibly allege that Barrick did not in fact undertake a number of remedial measures intended to prevent spills, as needed to render Palmes's February 16 statement false or misleading.

### b. Scienter

Further, plaintiffs fail to plead a "strong inference of scienter" as to this statement. In order to plead a strong inference of scienter, plaintiffs must allege "either (1) that defendants had the motive and opportunity to commit fraud," or "(2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [the company] or its officers 'benefitted in some concrete and personal way from the purported fraud.'" ECA, 553 F.3d at 198 (quoting Novak v. Kasaks, 216 F.3d at 307-08).

"Alternatively, if Plaintiffs cannot make the 'motive' showing, then they could raise a strong inference of scienter under the 'strong circumstantial evidence' prong." Id. at 198-99 (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)). In the absence of allegations of motive and opportunity, "the strength

of the circumstantial allegations must be correspondingly greater." Id. at 199 (quoting Kalnit, 264 F.3d at 142). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants . . . '[1] engaged in deliberately illegal behavior; [2] knew facts or had access to information suggesting that their public statements were not accurate; or [3] failed to check information they had a duty to monitor.'" Emps.' Ret. Sys. of the Gov't of the V.I. v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (quoting ECA, 553 F.3d at 199).

Here, plaintiffs do not meaningfully argue that defendants had motive and opportunity to defraud.[13] Plaintiffs attempt to stitch together an inference of scienter based on Palmes's knowledge of the falsity of his statement, Barrick executives' access to capital expenditure information recorded in the Oracle accounting system, and the "core operations" doctrine. These three pieces of circumstantial evidence, taken together, do not add up to a strong inference of scienter.

First, Palmes's alleged knowledge of the falsity of his statement depends on the occurrence of the March 2017 spill and an

_____

[13] Plaintiffs argue half-heartedly in a footnote that defendants were motivated to conceal Veladero's infrastructure problems in order to effectuate a 50% sale to Shandong, but the complaint contains no allegations regarding the negotiation process and no allegations supporting an inference that the sale would have failed had Shandong known the allegedly concealed extent of Veladero's problems. Indeed, the paragraph to which plaintiffs cite refers only to the occurrence of the sale and a subsequent plan for the making of improvements. See AC ¶ 58. And, in any event, "generalized desires," such as "the desire to achieve the most lucrative acquisition proposal," do not support an inference of scienter. Kalnit, 264 F.3d at 141.

Argentine official's May 2017 statement that replacement of pipes would have prevented the March 2017 spill. But each of those events occurred after Palmes's February 2017 statement, and they do not support the proposition that Palmes knew his statement was false at the time he made it.

Second, plaintiffs' references to the Oracle accounting system also do not support an inference of scienter. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008). Plaintiffs' broad allegations regarding expense and capital cost data are insufficient, as plaintiffs do not identify what specific facts these data would have contained that contradicts Palmes's statement that "a series of remedial works" had been completed. See, e.g., In re PXRE Grp. Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (Sullivan, J.); cf. Dynex, 531 F.3d at 196 (rejecting plaintiff's "broad reference to raw data"). While plaintiffs reference the $500 million plan that Barrick and Shandong jointly submitted following the 2017 spill, and it is plausible that an expenditure of this magnitude would be reflected in an accounting system, there are no allegations supporting an inference that the remedial works that Barrick allegedly failed to complete at the time of Palmes's February 2017 statement would

have been of comparable magnitude such that their absence from some unspecified accounting report would have been noticeable.

Finally, the Second Circuit has not decided whether the "core operations" doctrine remains valid as a theory of scienter following the PSLRA, see Frederick v. Mechel OAO, 475 F. App'x 353, 356 (2d Cir. 2012) (declining to decide whether "the 'core operations' doctrine survives as a viable theory of scienter" following the PSLRA), but the majority rule is to "consider the 'core operations' allegations to constitute supplementary, but not an independent, means to plead scienter," Schwab v. E*TRADE Fin. Corp., 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017) (Koeltl, J.) (internal quotation marks omitted); see, e.g., In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 352-53 (S.D.N.Y. 2011) (Sullivan, J.) (considering "core operations" allegations as "supplementary but not independently sufficient"). Regardless of the doctrine's viability, however, the "core operations" doctrine contributes little to the scienter analysis here. "[C]ourts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine.'" Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (Holwell, J.); In re BHP Billiton Sec. Litig., 276 F. Supp. 3d 65, 92 (S.D.N.Y. 2017) (citing Tyler), and the complaint alleges only that Veladero is "one of Barrick Gold's

five largest mines, which collectively account for 70% of the Company's gold production," AC ¶ 85; see also AC ¶ 29.

Tellabs directs that we are not "to scrutinize each allegation in isolation but to assess all the allegations holistically," 551 U.S. at 326, but these individually insufficient allegations do not combine to create an inference of scienter sufficient to satisfy the PSLRA. As the Second Circuit has recognized in a number of contexts, "[z]ero plus zero is zero." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 572 (2d Cir. 2011) (quoting MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 138 F.3d 33, 38 (2d Cir. 1998)). That principle applies here.

### 2. Barrick's March 30 and April 6, 2017 Press Releases

Plaintiffs identify as misleading the March 30 press release's statement that "[a]t this time, we do not anticipate a material impact to Veladero's 2017 production guidance," AC ¶ 65, and the April 6 press release's statement that Veladero "is expected to produce 770,000-830,000 ounces of gold in 2017, at a cost of sales of $750-$800 per ounce, and all-in sustaining costs of $840-$940 per ounce," AC ¶ 67. Plaintiffs argue that these statements are false and misleading because restrictions on the addition of cyanide reduced the efficiency of the gold cyanidation process, and production restrictions previously imposed following the 2015 and 2016 spills had "materially impacted production." AC ¶ 66; see AC ¶ 69. Defendants respond that the statements are

protected by the PSLRA's safe-harbor for forward-looking statements, 15 U.S.C. § 78u-5.

Under the PSLRA's safe-harbor provision, "a defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading. Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies." In re Vivendi, 838 F.3d at 245–46 (alterations incorporated) (internal quotation marks omitted) (quoting Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010)). We first consider whether the March 30 and April 6 statements satisfy the threshold criteria of being a forward-looking statement before considering whether they fall within the safe harbor under any of the three criteria.

### a. Forward-Looking Statement

The PSLRA defines the term "forward-looking statement" to be "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives

27

relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C) . . . ." 15 U.S.C. § 78u-5(i)(1). A statement need not be specifically labeled as forward-looking or segregated into a separate section to qualify for safe-harbor protection. See Slayton, 604 F.3d at 769 ("Nothing in the statute indicates that to be adequately identified, a forward-looking statement must be contained in a separate section or specifically labeled, and we decline to write in such a requirement."). Rather, a statement that "projects results in the future" is "plainly forward-looking," and the Second Circuit has acknowledged "the common-sense proposition that words such as 'expect' identify forward-looking statements." Id. That is, the "use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." Id.

The specific statements in the March 30 and April 6 press releases that plaintiffs identify are forward-looking. Barrick's

production guidance -- discussing the amount of gold expected to be produced and the costs of that production -- are projections of "other financial items" and "statement[s] of future economic performance" falling with the statutory definition of "forward-looking statement." See 15 U.S.C. § 78u-5(i)(1)(A), (C). Further, while Barrick did not specifically label these statements as forward-looking, the March 30 press release stated that Barrick "do[es] not anticipate a material impact" on production and the April 6 press release stated that Veladero "is expected to produce" a certain quantity of gold at certain cost levels and both press releases noted that "[a]ll statements, other than statements of historical fact, are forward-looking statements." AC ¶¶ 65, 68; ex. 8 at 1-2; id. ex. 9 at 3-4. Barrick's characterization of a statement as forward-looking is not dispositive, but the statements in question here fit within the statutory definition of "forward-looking statement" and therefore satisfy the PSLRA safe harbor's threshold criterion of being forward-looking.

Plaintiffs characterize Barrick's statements as misrepresenting the present fact that "the March 28, 2017 spill did not have any effect on production" [Pls.' Opp'n 13], but this statement is a mischaracterization. When coupled with Barrick's acknowledgement that cyanide restrictions had already been imposed (as of the March 30 statement), Barrick's statement that it did not anticipate "a material impact" on 2017 production can be

reasonably interpreted only as a statement that the restrictions imposed were impacting production, but not to a material extent. At bottom, the total amount of gold produced at Veladero in a given year -- the figures reflected in the production guidance -- can be assessed only at the end of the year, which was nine months into the future at the time the statements in question were made. As Judge Scheindlin has explained, "[f]orecasts of future events are necessarily contingent on present circumstances, but it is a game of semantics to label them as grounded in the present." Gissin v. Endres, 739 F. Supp. 2d 488, 507 n.106 (S.D.N.Y. 2010).[14]

Of course, a statement comparable to the March 30 and April 6 statements made later in the year would come closer to being a statement about present fact rather than a forward-looking statement. For example, a statement about ability to meet annual production guidance made on December 30 is not particularly forward-looking and could more reasonably be considered a statement of present fact. But here, where nine months remained in the production year and plaintiffs' own allegations suggest

_____

[14] For this reason, plaintiffs' reliance on Wagner v. Barrick Gold Corp., No. 03 Civ. 4302 (RMB) (S.D.N.Y. Sept. 29, 2004), is unavailing. Wagner held actionable Barrick's statements that its production costs were expected to decrease because Barrick was simultaneously undertaking processes that increased production costs, see id., slip op. at *12. While Wagner cited some case law regarding present misstatements, Barrick's predictions regarding its costs in the future are plainly "a statement containing a projection of . . . financial items" falling within the statutory definition of a "forward-looking statement." 15 U.S.C. § 78u-5(i)(1)(A). Accordingly, this holding in Wagner is best characterized as a forward-looking statement that was made with actual knowledge of falsity (i.e., Barrick could not reasonably have expected that costs would decrease given that it was simultaneously undertaking cost-increasing processes).

that recuperation of lost production is not only possible but a focus at Veladero, AC ¶ 46, the statements in question are best characterized as forward-looking.

### b. Meaningful Cautionary Language

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." Slayton, 604 F.3d at 772. "A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the [statements that] the plaintiffs challenge." Id. (quoting Inst. Investors Grp. v. Avaya, Inc., 564 F.3d 242, 256 (3d Cir. 2009)). That is, "the requirement for meaningful cautions calls for substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." Id. (internal quotation marks omitted) (quoting Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 372 (5th Cir. 2004)).

"To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials -- including the

31

cautionary language -- to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" In re Delcath Sys., Inc. Sec. Litig., 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (Schofield, J.) (quoting Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002)); see also, e.g., In re Aratana Therapeutics Inc. Sec. Litig., 315 F. Supp. 3d 737, 756 (S.D.N.Y. 2018) (Engelmayer, J.) (applying In re Delcath's two-step analysis).

By March 30, the Argentine authorities had already imposed restrictions on Barrick's addition of cyanide to the leach pad, and Barrick had already so disclosed in the March 30 press release -- one of the very statements that plaintiffs allege to be misleading. Accordingly, the allegedly undisclosed risk must be that, moving forward, Argentine authorities would not permit Barrick to resume adding cyanide to the leaching process within a certain time -- a regulatory approval of the type identified in the cautionary language accompanying both press releases. Indeed, both releases include "timing of receipt of, or failure to comply with, necessary permits and approvals." Fernandez Johnson Decl. ex. 8 at 2; id. ex. 9 at 5. Accordingly, a reasonable investor would have understood that Barrick's projections as to how much gold would be produced by the end of 2017 were contingent on Argentine authorities' allowing Barrick to resume the addition of

cyanide in its leaching process. Because the press releases include cautionary language sufficient to prevent a reasonable investor from believing the contrary, that cautionary language is meaningful. See In re Delcath, 36 F. Supp. 3d at 333.

This identification of the allegedly undisclosed risk also allows us to readily dispense with plaintiffs' argument that Barrick's statements are not protected by the PSLRA safe harbor because the risks they concealed had already materialized. The PSLRA's safe harbor indeed does not apply to already-materialized risks, see Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."), but that principle has no application here. The fact that inability to add cyanide would impact (at some point) the efficiency of the gold leaching process is not so much a risk but a scientific certainty, and plaintiffs essentially so allege and argue. E.g., AC ¶ 44. Rather, the uncertainty lies in (i.e., the risks are) whether and for how long cyanide restrictions would be imposed. Barrick disclosed that Argentine authorities had, by March 30, imposed restrictions on the addition of cyanide pending the completion of certain remedial works, see Fernandez Johnson Decl. ex. 8 at 1, and the risk was that those authorities would not permit Barrick to resume the addition of cyanide within a certain time. The cautionary language attached to both the March

30 and April 6 statements warned that that regulatory approval might not be forthcoming, and it is therefore meaningful.

Nor does the inclusion of other risk factors (which did not transpire) in the press releases' cautionary language render the safe harbor inapplicable, as the securities laws does not demand clairvoyance of defendants.  See Novak, 216 F.3d at 309 ("Corporate officials need not be clairvoyant.").  Just as "a defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor," Slayton, 604 F.3d at 773, the inclusion of cautionary language as to other factors that turn out (with the benefit of hindsight) to have no impact does not detract from the meaningfulness of cautionary language, cf. In re MGT Capital Invs., Inc. Sec. Litig., No. 16 Civ. 7415 (NRB), 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) ("[W]hen defendants warn investors of a potential risk, they need not predict the precise manner in which [the] risks will manifest themselves." (alteration in original) (quoting In re AES Corp. Sec. Litig., 825 F. Supp. 578, 588 (S.D.N.Y. 1993) (Conner, J.)); Wilbush v. Ambac Fin. Grp., Inc., 271 F. Supp. 3d 473, 493 (S.D.N.Y. 2017) (Berman, J.) (similar); In re TVIX Sec. Litig., 25 F. Supp. 3d 444, 457 (S.D.N.Y. 2014) (Swain, J.) (similar).[15]

---

[15] Plaintiffs also rely on this Court's decision in In re BHP Billiton Securities Litigation, 276 F. Supp. 3d 65 (S.D.N.Y. 2017), in which we held

In sum, we conclude that the March 30 and April 6 statements identified by plaintiffs were accompanied by meaningful cautionary language. Those statements are therefore not actionable because they fall within the PSLRA's safe harbor.

### c. Actual Knowledge of Falsity

The PSLRA's safe harbor applies for the additional reason that plaintiffs fail to plausibly allege that these forward-looking statements were "made with actual knowledge that it was false or misleading." In re Vivendi, 838 F.3d at 245. Plaintiffs contend that Barrick knew that its production estimates were false because the individual defendants received daily production reports from Veladero, Barrick had a history of maintaining production guidance despite previous spills and the production restrictions consequently imposed by the Argentine authorities, and Barrick admitted that restrictions on the addition of cyanide reduced production.[16]

Lacking in these theories, however, is any plausible inference that reduced production over the course of two and nine days -- the amount of time that the production restrictions had

_____

that general disclosures about breaches of tailings dams were insufficient to render "very particular, concrete, and grave risks relating to" a specific dam immaterial by virtue of having already been in the public domain, id. at 83. This analysis in BHP -- which relates to materiality -- has little bearing on our analysis of the "meaningful cautionary language" prong of the PSLRA safe harbor.

[16] Plaintiffs also rely on the core operations doctrine, which we have already found inapplicable as to Barrick and Veladero.

been in place following the March 28 leak when the March 30 and
April 6 statements were made -- has a material impact on total
production assessed as of year-end. Accordingly, accepting that
Barrick executives (including several of the individual
defendants) received daily production updates from Veladero
reflecting decreased production day-to-day, AC ¶¶ 45, 84, whether
these production updates reflected decreases that were significant
enough to call into question Barrick's annual production guidance
is a separate question and is unsupported by plaintiffs'
allegations. For example, considering CW1's estimate that gold
production was reduced by up to 10% on days when cyanide solution
was not added to the leach pad, AC ¶ 44, restrictions in place for
a period of 18 days (the length of time between Barrick's April 6
statement and April 24 corrective disclosure) would amount to only
a 0.5% reduction in annual production. Restrictions would need to
be in place for a substantial period before overall <u>annual</u>
production would be impacted, and plaintiffs do not seriously
engage with the mismatch in temporal scope between restrictions in
effect for a number of days and annual production reflected in
production guidance.

Nor does Barrick's history of maintaining annual production
guidance in the face of operating restrictions imposed after the
2015 and 2016 spills support an inference of scienter. Plaintiffs
label as baseless Barrick's maintenance of annual production

guidelines, but they also do not argue that Barrick in fact failed to meet the production guidance it reaffirmed after the 2015 and 2016 spills. See Aug. 23, 2018 Hr'g Tr. 34:20-24 ("THE COURT: Are you arguing that Barrick missed production goals in 2015 and 2016? MS. MILLER: No, your Honor. THE COURT: No. MS. MILLER: We are not."). The fact that plaintiffs do not contend that Barrick missed its 2016 production guidance is particularly significant in that following the 2016 spill, the Argentine authorities had suspended production outright for 20 days, AC ¶ 48, (i.e., a 100% reduction of production on those days) rather than merely restricting the addition of cyanide to the leaching process, AC ¶ 56. Given that plaintiffs do not argue that Veladero having been subject to processing restrictions for 9 days in 2015 and further subject to the wholesale suspension of production for 20 days in 2016 caused Barrick to miss its production guidance in those years, the impact on production that the imposition of cyanide restrictions for 2 and 9 days following the March 2017 spill is wholly insufficient to raise a plausible inference that the March 30 and April 6 statements regarding 2017 production guidance were made with actual knowledge of falsity.

Further, any inference that defendants knew that the March 30 and April 6 press releases' reaffirmance of the production guidance was false -- that is, defendants knew as of March 30 and April 6 that the 2017 production guidance was unattainable -- is undermined

37

here by CW1's statements that Barrick placed great emphasis on the catching-up of behind-target production, AC ¶ 46, and by the fact that nine months in the production year remained at the time the March 30 and April 6 statements were made. We therefore conclude that the March 30 and April 6 statements fall within the PSLRA's safe harbor for the additional reason that plaintiffs fail to plausibly allege that these statements were made with actual knowledge of their falsity.[17]

                              *    *    *

In sum, we hold that plaintiffs have failed to plausibly allege that Palmes's February 16 statement was false or made with scienter and that the remaining statements are forward-looking statements protected by the PSLRA's safe harbor.

### 3.   Loss Causation

Given the foregoing, we need not address the parties' loss causation arguments. Nonetheless, we note here that plaintiffs' theory of loss causation as to the alleged partial disclosure on March 29 borders on the nonsensical. As an initial matter, plaintiffs allege that Barrick's stock price dropped over the

---

[17] Given the foregoing analysis, plaintiffs would equally fail to plausibly plead the lower scienter requirement of conscious recklessness generally applicable to non-forward-looking statements. See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014) (defining "recklessness as a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it'" (quoting Novak, 216 F.3d at 308, 312)).

period from March 27 (a Monday) to March 30 (a Thursday), an expansive window that is difficult to reconcile with their allegations, AC ¶ 91, that Barrick's stock trades in an efficient market allowing them to rely on the presumption of reliance set forth in Basic Inc. v. Levinson, 485 U.S. 224 (1988).  See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 207 (2d Cir. 2008) (noting, under Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), and progeny, the importance of "[e]vidence that unexpected corporate events or financial releases cause an immediate response in the price of a security" in analyzing whether the Basic presumption applies (emphasis added)).

In actuality, Barrick's stock price closed at $19.60 on March 27, decreased to $19.08 at close on March 28, increased to $19.19 at close on March 29, and decreased to $18.84 at close on March 30.  Plaintiffs contend that the decrease in price on March 28 is attributable to the occurrence of the spill which partially revealed the falsity of Palmes's February 16 statement, that the increase on March 29 is attributable to Barrick's press release containing reassurances that there were no impacts on the environment or local residents, and that the decrease on March 30 is attributable to Barrick's disclosure of cyanide restrictions in the press release issued that day.  [Pls.' Opp'n 28 n.19.]

However, the occurrence of the spill by itself cannot plausibly be considered a disclosure, particularly when

plaintiffs' allegations of Barrick's intent and ability to conceal spills and prevent their disclosure are considered.[18] <u>E.g.</u>, AC ¶¶ 38, 47, 48.  But even accepting plaintiffs' hindsight-inflected theory that the March 28 spill amounted to a partial corrective disclosure of Palmes's February 16 statement (which we conclude is implausible as analyzed above), that disclosure was made to (and would have impacted) the market on March 29 -- not March 28.  Given that Barrick's stock price increased on March 29, rather than decreased, it is far from clear that plaintiffs have met their burden as to loss causation -- even though that burden is a low one at the pleading stage.  <u>See</u> <u>Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC</u>, 750 F.3d 227, 232-33 (2d Cir. 2014) ("In order to plead corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which 'the available public information regarding the company's financial condition [was] corrected,' <u>and that the market reacted negatively to the corrective disclosure</u>." (emphasis added) (citation omitted) (alteration in original) (quoting <u>In re Omnicom Grp., Inc. Sec. Litig.</u>, 597 F.3d 501, 511 (2d Cir. 2010))).

Plaintiffs' loss causation allegations as to the Barrick's April 24 announcement of its 2017 First Quarter results fare

---

[18] Further, the spill happened at approximately 5:15 p.m. on March 28 -- after the trading day in New York had concluded.  <u>See</u> Letter from Kim E. Miller to the Court, Aug. 27, 2018, ECF No. 59.  (On March 28, 2017, Argentina and Veladero would have been one hour ahead of New York.)  Any allegation that this information is capable of traveling back in time would, of course, be implausible.

better, but only somewhat.  Further, while "[p]laintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price," id. at 233, plaintiffs would have needed to so prove had their case proceeded beyond this motion to dismiss, see In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 36 (2d Cir. 2009) (requiring disaggregation at the proof stage); see also Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) (holding that disaggregation "is a matter of proof at trial").  Defendants identify -- accurately -- that Barrick's April 24 disclosure contained a litany of negative information about the company unrelated to gold production at Veladero.  While these arguments are premature on a motion to dismiss and therefore do not form a basis of our dismissal of the section 10(b) and Rule 10b-5 claims to they extent they are based on the March 30 and April 6 statements, there is no reason to believe that these confounding factors would not have presented plaintiffs with serious difficulties of proof were the case to proceed beyond the pleading stage.

C. **Section 20(a)**

Plaintiffs also allege that the individual defendants, Dushnishky, Raw, Williams, and Palmes, are liable under Section 20(a) of the Exchange Act because they acted as "controlling persons" of Barrick who participated in the alleged securities

fraud.  AC ¶¶ 112-17.  Section 20(a) provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  To establish a prima facie case of control-person liability under section 20(a), a plaintiff must sufficiently allege a primary violation by the controlled person. See ATSI, 493 F.3d at 108.  Because plaintiffs have failed to plead a primary violation on Barrick's part, their Section 20(a) claims necessarily fail.  See Slayton, 604 F.3d at 778.

### III. Conclusion

For the foregoing reasons, we grant defendants' motion to dismiss in its entirety.  This dismissal will operate with prejudice.  Plaintiffs make a token request for leave to amend in their opposition [Pls.' Opp'n 30 n.23], but we conclude that leave to amend would be futile here given the fundamental substantive problems in plaintiffs' allegations.  See Lopez v. CTPartners Exec. Search Inc., 173 F. Supp. 3d 12, 44 (S.D.N.Y. 2016) ("[W]here the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" (quoting Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000))).  The

February 16 statement is not actionable because plaintiffs failed

to plausibly plead that it was false or misleading and failed to

plausibly plead a strong inference of scienter, and no further

allegations could remove the March 30 and April 6 statements from

the PSLRA's safe harbor.

Accordingly, the Clerk of the Court is respectfully directed

to enter judgment for defendants; to terminate this case and any

motions pending therein; and to terminate the related case, No. 17

Civ. 3815.[19]

**SO ORDERED.**

Dated:    New York, New York
          September 24 2018

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

_____

[19] While creativity in legal argument may be appropriately encouraged,
creativity in the formatting of motions papers is not. Plaintiffs' choice of
creative, nay, noncompliant spacing in its memorandum in opposition, see Local
Civil Rule 11.1(b)(3), has not gone unnoticed, is unappreciated, and is in fact
particularly inexcusable in light of the previously enlarged page limit
applicable to that memorandum, see Jan. 3, 2018 Order, ECF No. 47.

43